Juan Thomas ABREU, et al., Plaintiffs,

v.

John J. CALLAHAN, et al., Defendants.

The CITY OF NEW YORK, et al., Plaintiffs,

v.

The UNITED STATES of America, et al., Defendants.

Nos. 97 CIV. 2126(LAK), 97 CIV. 2133(LAK).

United States District Court, S.D. New York.

July 24, 1997.

Helaine Barrett, Scott A. Rosenberg, Dennis Boyd, The Legal Aid Society, Yisroel Schulman, Froska A. Alfonso, Michael D. Scherz, New York Legal Asst. Grp., Nancy Chang, Alan Levine, Laura Davis, Center for Constitutional Rights, Jill Ann Boskey, Christopher James Bowes, Center for Disability Advocacy, for Plaintiffs in No. 97–2126.

Gail Rubin, Hilary B. Klein, June R. Buch, Asst. Corp. Counsel, Paul A. Crotty, Corp. Counsel of the City of New York, for City of New York.

Leon B. Gold, John Diegel, Chloe Wasserman, Proskauer Rose Goetz & Mendelsohn,

L.L.P., for Individual Plaintiffs in No. 97–2133.

Jonathan A. Willens, Asst. U.S. Atty., Mary Jo White, U.S. Atty., Arthur J. Fried, Gen. Counsel, Social Sec. Admin., James S. Gilliland, Gen. Counsel, Dept. of Agriculture, Richard G. Lepley, David M. Souders, U.S. Dept. of Justice, for Defendants.

## OPINION

KAPLAN, District Judge.

For many years, lawful resident aliens who were impoverished and either blind, disabled, or aged were entitled to receive Supplemental Security Income ("SSI") benefits and food stamps. Section 402 of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (hereinafter the "Welfare Reform Act"),[1] which was signed into law on August 22, 1996, disqualified many lawful resident aliens—including those who already were in the United States and already receiving or eligible for SSI and food stamps—from receiving those benefits.

This case does not present the question whether Congress may provide that aliens who enter or become permanent residents of the United States on or after August 22, 1996 may not receive welfare benefits. Plaintiffs, however, contend that the application of Section 402 to persons who already were legal resident aliens on the date the Welfare Reform Act became law violates the Due Process Clause of the Fifth Amendment. They seek a preliminary injunction barring its enforcement against such persons. Defendants seek dismissal of the complaints.

---

1. Pub.L. No. 104–193, 110 Stat. 2105, 2262, codified at 8 U.S.C. § 1612(a)(1) (Supp.1997).

2. 42 U.S.C. § 1381 et seq.

3. See H.R. Rep No. 231, 92d Cong., 1st Sess. 156 (1972), reprinted in 1972 U.S.C.C.A.N. 4989, 5142.

4. 42 U.S.C. § 1382c(a).

5. Id. §§ 1382a, 1382b. The income of sponsors of legal permanent resident aliens who were admitted to the United States after 1990 and who

*Facts*

*The Programs at Issue*

The SSI program provides subsistence-level income for the most disabled and financially needy members of our society.[2] The program was created in order to meet "the most basic needs" of impoverished aged, blind and disabled individuals.[3]

In order to qualify for SSI benefits, one must be at least 65 years of age, have corrected visual acuity of 20/200 or less in the better eye or equivalent loss of vision, or be "unable to engage in any substantial gainful activity" by reason of a medically determinable impairment or combination of impairments lasting at least twelve months.[4] Moreover, eligibility is restricted to applicants with no more than $2,000 in resources and whose income (including any "deemed" income) is below the applicable SSI benefit level.[5]

The Food Stamp Program was enacted in 1964 and is administered by the Department of Agriculture. Based on a congressional finding that "the limited food purchasing power of low-income households contributes to hunger and malnutrition among members of such households,"[6] the program provides stamps that are used as scrip for the purchase of foodstuffs by eligible persons.[7] Eligibility is restricted to households with net incomes below the federal poverty level and resources below $2,000 or, if a household member is disabled or age 60 or older, below $3,000.[8] Any household that includes a recipient of SSI automatically is eligible for food stamps.[9]

*The Welfare Reform Act*

The Welfare Reform Act was a result of extensive legislative activity concerning revi-

---

were disabled at the time of entry is deemed available to the alien for three years irrespective of whether it is available in fact. Id. § 1382j(a).

6. 7 U.S.C. § 2011.

7. The amount of the food stamp allotment varies according to the household's shelter expenses. 7 U.S.C. § 2014(e).

8. Id. §§ 2014(c), 2014(g).

9. Id. § 2014(a).

sion of welfare benefit programs funded by the federal government. This activity took place against a background of increasing numbers of immigrants on the welfare rolls at even more sharply increasing costs. According to a General Accounting Office report issued in February 1995, the number of immigrants receiving SSI increased from 151,207 in 1983 to 683,178 in 1993.[10] The proportion of SSI recipients who were not citizens grew from 6 percent in 1986 to 12 percent in 1994.[11] The growth rate in noncitizen SSI cases, although it had tapered off from even higher earlier levels, remained almost double the rate of increase among citizens.[12] This increase in the noncitizen case load was compounded by the increase in the cost of benefits, which quadrupled overall between 1980 and 1996.[13]

Section 402(a)(1) of the Welfare Reform Act provides, with certain exceptions, that "[n]otwithstanding any other provision of law and except as provided in paragraph (2), an alien who is a qualified alien ... is not eligible for" SSI or food stamps.[14] The term "qualified alien" includes permanent resident aliens.[15] The exceptions include permanent resident aliens who have "worked 40 qualifying quarters of coverage as defined under Title II of the Social Security Act"[16] and veterans and certain military personnel on active duty and their spouses and children.[17] The effect of the Act therefore is to disqualify many, but not all, permanent resident aliens from receiving SSI and food stamps. Those permanent resident aliens excepted

from Section 402(a)(1), however, remain eligible for SSI and food stamps on the same basis as citizens.

Section 402, as recently amended, directs the Commissioner of Social Security, by September 30, 1997, to redetermine the eligibility of aliens who were receiving SSI benefits as of August 22, 1996, and to terminate SSI benefits for those who do not satisfy the newly enacted statutory requirements.[18] For aliens who were not receiving benefits on August 22, 1996, Section 402 was effective immediately. In addition, the Social Security Administration ("SSA") takes the position that "aliens with claims and appeals of denied claims [as of August 22, 1996] are subject to the eligibility rules [of Section 402] for the entire period in the life of the application, including the months before August 1996."[19] The SSA thus intends to deny benefits for periods prior to August 22, 1996 to lawful permanent residents whose applications had not yet been granted even if they were qualified under the eligibility rules applicable during those periods.

*The Impact of the Act*

*The Individual Plaintiffs and the Alleged Class*

The individual plaintiffs, like all of those affected by the challenged aspect of this legislation, are aged, blind and/or totally disabled and extremely poor. Most were receiving SSI benefits and food stamps on August 22, 1996 and face termination of

10. General Accounting Office, Welfare Reform· Implications Of Proposals On Legal Immigrant's Benefits, (Feb.1995) at 7 (Def.Ex. A).

11. General Accounting Office testimony, Supplemental Security Income· Noncitizen Caseload Continues To Grow at 4 (May 23, 1996) (Def.Ex. B).

12. *Id.*

13. *See* 142 Cong. Rec S9357 (Aug. 1, 1996) (Sen.Nickles).

14. Welfare Reform Act § 402(a)(1), 8 U.S.C. § 1612(a)(1).

15. *Id.* § 431(b), 8 U.S.C. § 1641(b).

16. The Social Security Act of 1935, as amended, is codified at 42 U.S.C. § 1395j *et seq.* (Supp. 1997).

17. Welfare Reform Act § 402(a)(2), 8 U.S.C. § 1612(a)(2). The Act exempts also from Section 402(a)(1) for a period of five years refugees, asylees, and aliens whose deportation has been withheld under Section 243(h) of the Immigration and Nationality Act, 8 U.S.C. § 1253(h). Welfare Reform Act § 402(a)(2)(A), 8 U.S.C. § 1612(a)(2)(A).

18. *Id.* § 402(a)(2)(D)(i), 42 U.S.C. § 1612(a)(D)(i), as amended by Pub.L. No. 105–18, 111 Stat. 158, 191 (June 12, 1997).

19. SSA Program Operations Manual System SI 00502.150, *SSI Eligibility for Aliens Receiving Benefits on 8/22/96* ¶ A.2 (appended to Def. Rpy. Mem.).

those benefits on September 30, 1997.[20] Those in the *Abreu* case seek to represent a class consisting of all lawful permanent residents in New York State, Connecticut and Vermont who (1) are or will be age 65 or older, blind, or disabled; (2) were residing in the United States on August 22, 1996, (3) either (i) were recipients of SSI on August 22, 1996, or (ii) are or will be applicants for SSI benefits, and (4) have been or will be disqualified from receiving SSI and food stamps by operation of Section 402.[21]

The impact of this legislation on the individual plaintiffs and the class will be severe. The 1997 federal SSI benefit rate for one person is $484 per month. For SSI recipients living alone in New York State, this rate is increased by a New York State supplement to as much as $570,[22] still a figure far below the current poverty level of $657.50 per month.[23] According to a recent study, the average monthly rent of New York SSI recipients was $306. Thus, those who receive the total $570 benefit are left, on average, with $264 plus an average of $86 per month in food stamps to cover all of the other necessities of life.[24] Section 402 will deprive these individuals of SSI benefits and food stamps, thus leaving them with no income at all. If they succeed in qualifying for state public assistance benefits, the monthly incomes of those in New York City will drop to $352 per month,[25] leaving (after payment of rent) an average of $46 per month for food, transportation and all other needs.[26]

Absent congressional action [27] or substantially increased state and local assistance, the practical consequences of Section 402 are likely to include evictions, homelessness, and inability to afford unreimbursed medical expenses.[28] Many members of the alleged class, and a number of the individual plaintiffs, have neither family nor sponsors to whom to turn.[29] Age and infirmity prevent a number of the individual plaintiffs and class members from becoming citizens and thus qualifying for benefits. There is no reason to suppose that the resources of private charitable institutions are sufficient to fill entirely the role previously filled by federal benefits.

### The City of New York

Section 402 threatens the City of New York with serious consequences as well. According to data from the SSA, approximately 73,000 persons, almost 20 percent of the current SSI recipients in the City, are likely to be rendered ineligible for SSI and food stamps by this statute.[30] The City Office of Management and Budget ("OMB") estimates that in the fiscal year ended June 30, 1997, 2,000 applicants or prospective applicants who were in the country on August 22, 1996 would have qualified for SSI benefits and

---

20. Welfare Reform Act § 402(a)(2)(D)(i), 42 U.S.C. § 1612(a)(2)(D)(i), as amended by Pub.L. No. 105–18, 111 Stat. 158, 191 (June 12, 1997).

21. Pl. Class Cert. Mem. 1.

22. *See* N.Y. Soc. Serv. L. § 209, subd. 2(a) (McKinney 1992).

23. *See* 62 Fed.Reg. 10856 (Mar. 10, 1997).

24. Krueger Aff. ¶ 13.

25. *Id.* ¶ 14.

26. Under state law, there would be a minimum delay of 45 days before the payment of any benefits. (Casey Decl. ¶ 8)

27. Legislation is pending in Congress which, if adopted, would ameliorate the harshness of Section 402 as it applies to the class plaintiffs seek to represent. On June 25, 1997, the House passed H.R.2015, which would restore eligibility to aliens who were receiving SSI benefits prior to August 22, 1996 (H.R.2015 § 9302) (143 Cong. Rec. H4416–4554). On the same day, the Senate passed S. 947, which would: (1) restore SSI eligibility to aliens who were receiving benefits before Section 402 was enacted (S. 947 § 5811); (2) restore SSI eligibility to aliens who resided in the U.S. before passage of Section 402 and who are or become disabled (§ 5814); (3) disconnect food stamp eligibility from SSI eligibility for these groups of aliens (§ 5816); and (4) restore SSI eligibility for severly disabled aliens who, by virtue of their disability, have had their naturalization applications refused (§ 5819) (143 Cong Rec. § 6557–6666). The legislative prospects, however, remain unclear. Robert Pear, *G.O.P. Feud in House Stalls Budget Talks*, New York Times, July 22, 1997, at A15:1.

28. Horvath Decl. ¶ 14.

29. Klein Aff. ¶ 5; McHugh Decl. ¶ 11.

30. Smith Decl. ¶ 6.

food stamps had Section 402 not gone into effect.[31]

The financial burden that will be shifted to the City is substantial. Those who previously would have qualified for SSI may be eligible for public assistance benefits, such as home relief or aid to dependent children ("ADC"), funded in part by the City.[32] OMB estimates that the denial of SSI and food stamps to legal immigrants who were in the country before the date of the statute's passage will cost the City about $268 million in federal funds.[33] The cost to the City of providing home relief and ADC to eligible legal immigrants who were in this country prior to August 22, 1996 is estimated at $73 million for the fiscal year ended June 30, 1998.[34] Moreover, as home relief and ADC benefits are significantly lower than SSI benefits, legal aliens formerly eligible for SSI and food stamps are likely to experience increased poverty, which is likely to result in a variety of unquantifiable social costs for the City.[35]

## Discussion

The complaints allege that Section 402 of the Welfare Reform Act is unconstitutional as applied to legal permanent resident aliens who resided in the United States before August 22, 1996 because it improperly discriminates between citizens and permanent resident aliens in violation of the Due Process Clause of the Fifth Amendment. Alternatively, they allege that the SSA's interpretation of Section 402 with respect to benefits for periods prior to August 22, 1996 is unlawful because (1) it applies the Welfare Reform Act retroactively in a manner contrary to settled law, and (2) the manner in which the SSA policy was promulgated did not comply with the notice and comment requirements of the Administrative Procedure Act.[36] Now be-

fore the Court are the government's motions to dismiss the complaints, the plaintiffs' motions for preliminary injunctions, and the motion of the *Abreu* plaintiffs to certify the alleged class pursuant to FED. R. CIV. P. 23.

## I. The Equal Protection Challenge

### A. The Level of Scrutiny

The level of scrutiny applied to measures challenged on equal protection grounds often is dispositive. Measures which classify on the basis of race, for example, typically are assessed in terms of whether those measures are necessary to further a compelling governmental interest,[37] a standard that usually results in the invalidation of the measure under consideration. At the other extreme are enactments that involve, among other things, ordinary economic matters. In such cases, courts inquire as to whether the legislature rationally could have believed that the measure was an appropriate means to a legitimate end,[38] a standard so deferential to the legislature that statutes to which it is applied seldom are invalidated.

Plaintiffs' position, though variously stated, is that Section 402 must be subjected to heightened constitutional scrutiny because aliens are a "suspect class" or a "discrete and insular minority" which frequently has been victimized by discrimination and which is singularly unable to protect itself through the political process because by its very nature its members are not entitled to participate in the political life of the nation. Whether measured by this exacting standard or even by the far more deferential rational basis test, plaintiffs maintain that there is insufficient connection between Section 402 and any legitimate governmental purpose to satisfy the Constitution. The starting point of analysis, however, is the determination whether plaintiffs are correct in urging that Section 402 be

---

31. Parish Decl. ¶ 6.

32. Smith Decl. ¶ 12.

33. Parish Decl. ¶ 4.

34. *Id.* ¶ 5.

35. Smith Decl. ¶ 21.

36. 5 U.S.C. § 500 *et seq.* (1996).

37. *See, e.g., Loving v. Virginia*, 388 U.S. 1, 11, 87 S.Ct. 1817, 1823, 18 L.Ed.2d 1010 (1967).

38. *See, e.g., FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993); *United States v. Carolene Products*, 304 U.S. 144, 153, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938).

subjected to heightened rather than rational basis scrutiny.

It is important to recognize at the outset that the plaintiffs to some extent mischaracterize Section 402. Contrary to their assertion, the statute does not discriminate between citizens and permanent resident aliens, treating all members of each group alike and the two groups differently. Rather, Congress has continued the eligibility of permanent resident aliens who have worked 40 calendar quarters qualifying under the Social Security Act, as well as that of veterans and certain military personnel and their families, for SSI benefits and food stamps on the same basis as United States citizens. The disadvantaged group consists of permanent resident aliens who lack these qualifications. Thus, the pertinent question is whether the distinction between two groups of lawful permanent resident aliens—those who do and who do not have the requisite work histories—is constitutional.

The most directly relevant case is the Supreme Court's decision in *Mathews v. Diaz.*[39] In *Mathews*, the Court considered the constitutionality of a provision of the Social Security Act which conditioned the eligibility of aliens for participation in the Medicare Part B supplemental medical insurance program on continuous residence in the United States for five years and admission for permanent residence. The Court began its analysis by positing that aliens are not entitled to "all of the advantages of citizenship or, indeed, to ... be placed in a single homogenous legal classification."[40] It recognized that Congress, "[i]n the exercise of its broad power over naturalization and immigration, ... regularly makes rules that would be unacceptable if applied to citizens" and that a distinction by Congress between citizens and aliens "does not in itself imply that such disparate treatment is 'invidious.' "[41] Having done so, however, it focused directly on the fact that the legislation there at issue did not in fact distinguish between citizens and aliens.

Rather, like Section 402 of the Welfare Reform Act, it classified aliens into two groups—one eligible for a federal benefit program and one not.[42] It proceeded to note the special importance of broad deference to the political branches in matters affecting aliens, "[s]ince decisions in these matters may implicate our relations with foreign powers ..."[43] And an unanimous Court proceeded to uphold the challenged statute under a deferential standard of review, saying:

"Since it is obvious that Congress has no constitutional duty to provide *all aliens* with the welfare benefits provided to citizens, the party challenging the constitutionality of the particular line Congress has drawn has the burden of advancing principled reasoning that will at once invalidate that line and yet tolerate a different line separating some aliens from others. In this case, the appellees have challenged two requirements—first, that the alien be admitted as a permanent resident, and, second, that his residence be of a duration of at least five years. But if these requirements were eliminated, surely Congress would at least require that the alien's entry be lawful; even then, unless mere transients are to be held constitutionally entitled to benefits, *some* durational requirement would certainly be appropriate. In short, it is unquestionably reasonable for Congress to make an alien's eligibility depend on both the character and the duration of his residence. Since neither requirement is wholly irrational, this case essentially involves nothing more than a claim that it would have been more reasonable for Congress to select somewhat different requirements of the same kind.

\* \* \* \* \* \*

"The task of classifying persons for medical benefits, like the task of drawing lines for federal tax purposes, inevitably requires that some persons who have an almost equally strong claim to favored

---

**39.** 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976).

**40.** *Id.* at 78, 96 S.Ct. at 1890.

**41.** *Id.* at 79–80, 96 S.Ct. at 1891.

**42.** *Id.* at 80, 96 S.Ct. at 1891–92.

**43.** *Id.* at 81, 96 S.Ct. at 1892.

treatment be placed on different sides of the line; the differences between the eligible and the ineligible are differences in degree rather than differences in the character of their respective claims. When this kind of policy choice must be made, we are especially reluctant to question the exercise of congressional judgment. In this case, since appellees have not identified a principled basis for prescribing a different standard than the one selected by Congress, they have, in effect, merely invited us to substitute our judgment for that of Congress in deciding which aliens shall be eligible to participate in the supplementary insurance program upon the same conditions as citizens. We decline the invitation." [44]

If, as defendants contend, *Mathews* controls here, Section 402 must be tested against a deferential standard rather than subjected to the heightened scrutiny for which plaintiffs argue. Plaintiffs understandably argue that *Mathews* is distinguishable. In order properly to evaluate this contention, it is helpful to place *Mathews* in the broader context of the constitutional treatment of immigration measures and alienage classifications.

### 1. The Plenary Immigration Power

The only reference to immigration and naturalization contained in the Constitution states: "The Congress shall have Power To ... establish an uniform Rule of Naturalization ..." [45] Nevertheless, the Supreme Court long has held that "over no conceivable sub-ject is the legislative power of Congress more complete than it is over" immigration.[46]

The genesis of this strain in our jurisprudence, which frequently is referred to as the plenary power doctrine, was *The Chinese Exclusion Case (Chae Chan Ping v. United States).*[47] The Supreme Court there upheld a statute that prohibited Chinese laborers, who had left the country with certificates issued under prior legislation and permitting them to return to the United States, from reentering the country. The Court viewed the federal power to exclude aliens as inherent in sovereignty, as distinguished from having been granted by any specific provision of the Constitution. It reasoned that actions with respect to the admission and exclusion of aliens are analogous to such national security matters as the exercise of the war power and implicate foreign relations concerns. In consequence, the Court said that actions by the political branches of government with respect to the admission and exclusion of aliens "are conclusive on the judiciary." [48]

Scholars have criticized the plenary power doctrine widely,[49] but the Court repeatedly has applied it to preclude or sharply limit judicial review of congressional actions with respect to the admission and exclusion of aliens.[50] It arguably has expanded the doctrine beyond actions directly controlling the crossing of our national borders by aliens to actions affecting immigration only more

**44.** *Id.* at 83–84, 96 S.Ct. at 1893 (emphasis in original).

**45.** U.S. CONST., Art. I, § 8.

**46.** *Oceanic Steam Navigation Co. v. Stranahan,* 214 U.S. 320, 339, 29 S.Ct. 671, 676, 53 L.Ed. 1013 (1909).

**47.** 130 U.S. 581, 9 S.Ct. 623, 32 L.Ed. 1068 (1889).

**48.** *Id.* at 606, 9 S.Ct. at 630.

**49.** *E.g.,* Michael Scaperlanda, *Partial Membership: Aliens and the Constitutional Community,* 81 IOWA L. REV. 707 (1996); Anne E. Pettit, *"One Manner of Law": The Supreme Court, Stare Decisis and the Immigration Law Plenary Power Doctrine,* 24 FORD URB. L.J. 165, 185–95 (1996); Lin-da S. Bosniak, *Membership, Equality, and the Difference That Alienage Makes,* 69 N.Y.U. L. REV. 1047 (1994); Hiroshi Motomura, *The Curious Evolution of Immigration Law: Procedural Surrogates for Substantive Constitutional Rights,* 92 COLUM L. REV. 1625 (1992); Louis Henkin, *The Constitution and United States Sovereignty: A Century of Chinese Exclusion and its Progeny,* 100 HARV L. REV. 853 (1987); Stephen H. Legomsky, *Immigration and the Principle of Plenary Congressional Power,* 1984 SUP. CT REV. 255 (1985).

**50.** Notwithstanding its repeated reliance on the doctrine, the Court on occasion has evidenced discomfort with its sweeping terms. *See Galvan v. Press,* 347 U.S. 522, 530, 74 S.Ct. 737, 742, 98 L.Ed. 911 (1954) (observing that "much could be said" in favor of placing constitutional limits on plenary power "were we writing on a clean slate").

remotely if it all.[51] The Court, moreover, has continued to ascribe undiminished validity to the doctrine.[52] Nevertheless, the Court over time has expanded the permissible scope of review incrementally.[53] While the standard applied in recent years has been phrased in slightly different terms and in any case remains deferential,[54] the Court's most recent formulation is that congressional action pursuant to the plenary power is subject to rational basis review.[55] And while the government maintains that the controlling standard in plenary power cases is the "wholly irrational" formulation articulated in *Mathews v. Diaz*, the government acknowledged at oral argument that there is no substantive difference between that standard and conventional rational basis review.[56] In consequence, Section 402(a)(1) must pass muster under the rational basis standard or its substantial equivalent even if it is viewed as an exercise of the plenary immigration power.

■ To be sure, the fact that rational basis is the appropriate standard of review of exercises of the plenary immigration power does not necessarily dispose of the issue presented here. It may be argued that any action affecting the treatment of aliens admitted to this country may affect immigration or, for that matter, touch on foreign relations concerns. Hence, it is arguable that all such actions are within the plenary power. Yet it is far from evident that the foundation laid in *The Chinese Exclusion Case* and buttressed by the Court's subsequent plenary power cases supports such an imposing edifice. The Court, for example, repeatedly has held that aliens are entitled to some constitutional protections, holdings which demonstrate that the Court has not regarded all congressional judgments affecting aliens as "conclusive on the judiciary." [57] And the government acknowledged at oral argument that actions implicating fundamental substantive rights would warrant more searching judicial scrutiny.[58]

Were there a material difference between the degree to which plenary power measures are subject to judicial review and the level of scrutiny applied to other classifications of aliens, delineation of the precise sphere of the plenary power doctrine would be indispensable. It appears, however, that there is not.

51. Indeed, if *Mathews v. Diaz* properly is viewed as a plenary power case, a matter on which the Court was not specific, the doctrine was extended sub silentio to apply to congressional actions affecting the conditions in which aliens lawfully reside in this country, quite removed from the question whether they should be permitted to enter and remain in the first place.

52. *See, e.g., Reno v. Flores*, 507 U.S. 292, 306, 113 S.Ct. 1439, 1449, 123 L.Ed.2d 1 (1993). The Court had an opportunity to overrule the doctrine in *Jean v. Nelson*, 472 U.S. 846, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985), but instead decided the case on statutory grounds. *Id.* at 853–55, 105 S.Ct. at 2996–97.

53. *See, e.g., Legomsky*, 1984 Sup. Ct. Rev at 257.

54. *Hampton v. Mow Sun Wong*, 426 U.S. 88, 101 n. 21, 96 S.Ct. 1895, 1904 n. 21, 48 L.Ed.2d 495 (1976) (hereinafter cited as *Hampton I* ) ("largely immune from judicial control"); *Kleindienst v. Mandel*, 408 U.S. 753, 770, 92 S.Ct. 2576, 2585, 33 L.Ed.2d 683 (1972) (law must be supported by facially legitimate and *bona fide reason)*; *Shaughnessy v. Mezei*, 345 U.S. 206, 210, 73 S.Ct. 625, 628, 97 L.Ed. 956 (1953) ("subject only to narrow judicial review").

55. *Flores*, 507 U.S. at 306, 113 S.Ct. at 1449 (regulation pursuant to plenary power "must still meet the (unexacting) standard of rationally advancing some legitimate government purpose."). *Accord, Azizi v. Thornburgh*, 908 F.2d 1130, 1133 (1990) ("[s]uch classifications will be upheld against a constitutional challenge if a rational basis exists for their adoption.").

56. Transcript, June 30, 1997 ("Tr."), at 43–44.

57. *See, e.g., Landon v. Plasencia*, 459 U.S. 21, 32, 103 S.Ct. 321, 329, 74 L.Ed.2d 21 (1982); *Johnson v. Eisentrager*, 339 U.S. 763, 770–71, 70 S.Ct. 936, 940, 94 L.Ed. 1255 (1950) *(dicta); Wong Yang Sung v. McGrath*, 339 U.S. 33, 49–50, 70 S.Ct. 445, 453–54, 94 L.Ed. 616 (1950); *Bridges v. Wixon*, 326 U.S. 135, 156–57, 65 S.Ct. 1443, 1453–54, 89 L.Ed. 2103 (1945); *The Japanese Immigrant Case (Yamataya v. Fisher)*, 189 U.S. 86, 100–01, 23 S.Ct. 611, 614–15, 47 L.Ed. 721 (1903) *Wong Wing v. United States*, 163 U.S. 228, 237–38, 16 S.Ct. 977, 981, 41 L.Ed. 140 (1896); *Fong Yue Ting v. United States*, 149 U.S. 698, 724, 13 S.Ct. 1016, 1026, 37 L.Ed. 905 (1893) (all involving procedural rights of aliens in immigration or criminal proceedings).

58. Tr. 32–36.

### 2. Federal Alien Classifications

Government distinctions among those subject to its power evoke a core value of our nation, the premise that our public institutions "must govern impartially." [59] This value is most prominent in the Equal Protection Clause of the Fourteenth Amendment, which provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." [60] It informs also the Due Process Clause of the Fifth Amendment, which has been held to impose restraints on the federal government comparable to those imposed on the states by the Equal Protection Clause.[61] Yet the differences in the language of these constitutional provisions, as well as the differing roles of the national and state governments in our federal system, result in different treatment of actions by federal and state government, respectively, which differentiate (i) between aliens and citizens and (ii) among groups of aliens.

Were the distinction drawn by Section 402 a feature of state legislation, the case would be governed by *Graham v. Richardson*,[62] much of the language of which at first blush appears equally applicable here. The Supreme Court there struck down state statutes that conditioned receipt of welfare benefits upon the recipient's possession of United States citizenship or upon his or her residence in this country for a specified number of years. The Court began by noting that the Equal Protection Clause speaks of "persons," thus affording protection to citizens and aliens alike.[63] It referred to aliens as "a prime example of a 'discrete and insular' minority . . . for whom . . . heightened judicial solicitude is appropriate." [64] And it concluded that the statutes at issue did not serve interests sufficiently compelling to justify the distinction they drew, given the heightened standard of review.[65] But the Court went on to adduce "[a]n additional reason why the . . . statutes . . . do not withstand constitutional scrutiny . . ." [66] Noting that the admission of aliens, their naturalization, and the regulation of their conduct prior to naturalization are within the exclusive powers of the federal government, the Court held also that the statutes at issue "encroach upon exclusive federal power [and] are constitutionally impermissible." [67]

*Graham* thus suggested what the Supreme Court later made explicit in *Hampton I*— "the Equal Protection and Due Process Clauses are not always coextensive. Not only does the language of the two Amendments differ, but more importantly, there may be overriding national interests which justify selective federal legislation that would be unacceptable for an individual *State*." [68] *Graham* and other cases dealing with state classifications based on alienage therefore have little bearing here.

■ Viewed against this background, *Mathews v. Diaz* comes sharply into focus. The case stands for the proposition that the level of judicial scrutiny of federal classifications involving alienage is far more deferential than that applied to the state [69] This difference is rooted in part in the difference in the language of the constitutional provisions applicable to the federal and state governments, respectively. It is grounded also in the national interest in regulating the circumstances in which aliens are permitted to reside in the United States, an interest which derives from uniquely federal foreign rela-

---

**59.** *Hampton I*, 426 U.S. at 100, 96 S.Ct. at 1903.

**60.** U.S. Const., Amend. XIV, § 1.

**61.** *E.g., Hampton I*, 426 U.S. at 100, 96 S.Ct. at 1903–04 ("The concept of equal justice under law is served by the Fifth Amendment as well as by the Equal Protection Clause of the Fourteenth Amendment.")

**62.** 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971).

**63.** *Id.* at 371, 91 S.Ct. at 1851–52.

**64.** *Id.* at 372, 91 S.Ct. at 1852.

**65.** *Id.* at 372–76, 91 S.Ct. at 1852–54.

**66.** *Id.* at 376, 91 S.Ct. at 1854.

**67.** *Id.* at 376–80, 91 S.Ct. at 1854–56.

**68.** *Hampton I*, 426 U.S. at 100, 96 S.Ct. at 1903–04.

**69.** *E.g., Note, Developments in the Law—Immigration Policy and the Rights of Aliens*, 96 Harv. L. Rev 1286, 1418–19 (1983).

tions and war power concerns [70] and which finds no counterpart at the state level.

This is confirmed by the great weight of authority in the lower federal courts including a decision in our own Circuit. In *United States v. Duggan,*[71] for example, the Second Circuit applied the rational basis test to uphold against an equal protection challenge provisions of the Foreign Intelligence Surveillance Act[72] that distinguished between citizens and aliens.[73] The *Duggan* Court based its holding on the deference the Supreme Court in *Mathews v. Diaz* accorded to Congress with regard to all matters relating to the treatment of aliens, which it described as a recognition by:

"the Court ... that it was appropriate that the political branches of government have the responsibility for regulating the relationship between the United States and aliens, since these matters implicate relations with foreign powers, and 'a wide variety of classifications must be defined in the

light of changing political and economic circumstances.' "[74]

*Moving Phones Partnership L.P. v. FCC*[75] is to the same effect as *Duggan.* The District of Columbia Circuit there rejected an equal protection challenge to a federal statute that prohibited aliens from obtaining licences to construct and operate cellular telephone systems. The court explained that "classifications based on alienage in federal statutes are permissible so long as the challenged statute is not a 'wholly irrational' means of effectuating a legitimate government purpose."[76]

In *Campos v. FCC,*[77] the Seventh Circuit applied the rational basis test in deciding a challenge to the validity of a regulation which prohibited granting to aliens licenses to work in the commercial radio industry. Although the government claimed that the classification at issue encouraged naturalization, the court did not base its standard of review on the immigration power. Instead, it held more broadly that federal "alienage-based

70. In *Mathews,* the Court reaffirmed its prior statement that " '[a]ny policy towards aliens is vitally and inextricably interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of a republican form of government. Such matters are entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.' " *Mathews,* 426 U.S. at 81 n. 17, 96 S.Ct. at 1892 n. 17 (*quoting Harisiades v. Shaughnessy,* 342 U.S. 580, 588–89, 72 S.Ct. 512, 518–19, 96 L.Ed. 586 (1952)) (footnote omitted).

71. 743 F.2d 59 (2d Cir.1984).

72. 50 U.S.C. § 1801 *et seq.* (1991 & Supp.1997).

73. Recent cases in this district regularly have evaluated equal protection challenges to federal alienage classifications, often those in the Hostage Taking Act, 18 U.S.C. § 1203 (Supp.1997), under the rational basis standard, usually following Duggan. *See United States v. Ni Fa Yi,* 951 F.Supp. 42, 44 & n. 3 (S.D.N.Y.1997) (*Duggan* "foreclosed" possibility that anything other than rational basis scrutiny could apply to alienage classification); *United States v. Yian,* 905 F.Supp. 160, 167 (S.D.N.Y.1995) (*Duggan* "unambiguous" in requiring rational basis review for Congressional alienage classifications); *United States v. Song,* No. 95 Cr. 129(KMW), 1995 WL 736872, at *3 (S.D.N.Y. Dec.13, 1995) ("federal laws that classify on the basis of alienage are subject only to rational basis analysis because of the immigra-

tion and foreign policy concerns inherent in the relationship between the federal government and aliens.") (citing *Mathews*); *United States v. Pacheco,* 902 F.Supp. 469, 472 (S.D.N.Y.1995) ("congressional power over aliens is political in nature and thus is subject to limited review") (citing *Hampton I*). *See also Letourneau v. Califano,* 453 F.Supp. 636, 638 (S.D.N.Y.1978) (three judge court) ("only minimal scrutiny is to be given federal statutory distinctions involving aliens"), *appeal dismissed,* 444 U.S. 805, 100 S.Ct. 26, 62 L.Ed.2d 18 (1979).

74. *Duggan,* 743 F.2d at 76 (quoting *Mathews,* 426 U.S. at 81, 96 S.Ct. at 1892).

75. 998 F.2d 1051, 1055 (D.C.Cir.1993), *cert. denied sub nom. Cellswitch L.P.v. FCC,* 511 U.S. 1004, 114 S.Ct. 1369, 128 L.Ed.2d 46 (1994).

76. *Id.* at 1056 (citing *Mathews*). *See also United States v. Lopez–Flores,* 63 F.3d 1468, 1474 (9th Cir.1995), *cert. denied sub nom., Hernandez v. United States,* —— U.S. ——, 116 S.Ct. 794, 133 L.Ed.2d 743 (1996); *Sudomir v. McMahon,* 767 F.2d 1456, 1464 (9th Cir.1985) (applying "not wholly irrational" standard to uphold denial of welfare benefits to asylum applicants because "federal classifications based on alienage are subject to relaxed scrutiny"); *Lopez v. Bergland,* 448 F.Supp. 1279, 1282–83 (N.D.Cal.1978) (three judge court) (same).

77. 650 F.2d 890, 894 (7th Cir.1981).

classifications are not under existing law suspect in any category of cases for Fifth Amendment purposes." [78] Like *Mathews, Duggan,* and *Moving Phones, Campos* based this conclusion on the fact that federal power over aliens partakes of the political and therefore should be reviewed narrowly by the judiciary.

Despite these clear indications that the appropriate standard of review in this case, irrespective of whether it is considered under the plenary power doctrine, is the rational basis test or its substantial equivalent, plaintiffs nevertheless contend for a more demanding level of scrutiny, advancing several arguments. Each, however, is without merit.

■ The *Abreu* plaintiffs begin with the assertion that only those federal alienage classifications "that in fact implicate the regulation of immigration" are within the plenary immigration power and that all alienage classifications outside the plenary power are subject to strict scrutiny. [79] As the foregoing discussion makes clear, the argument is untenable. While it is undeniable that the Court has extended certain substantive constitutional protections to aliens, [80] it is equally clear that it has declined to apply strict scrutiny to federal alienage classifications which arguably are not within the plenary immigration power. The eligibility of perma-

nent resident aliens considered by the Supreme Court in *Mathews* did not necessarily implicate the regulation of immigration but nevertheless was evaluated under a highly deferential standard. The matters at issue in *Moving Phones* and *Campos* were, if anything, even more clearly removed from the regulation of immigration, yet were reviewed under the rational basis test. And were there any doubt, it would be removed, at least in this Circuit, by *Duggan,* which quite clearly applied rational basis review to an alienage classification wholly unrelated to immigration. [81]

The *Abreu* plaintiffs' next argument for strict scrutiny is that the Supreme Court in *Adarand Constructors, Inc. v. Pena* [82] stated that "[e]qual protection analysis in the Fifth Amendment area is the same as that under the Fourteenth Amendment." [83] Plaintiffs would have the Court conclude from this sentence that the long established distinction between the equal protection analyses applied to federal and state legislation, respectively, has been abrogated and that *Mathews* no longer is good law. The argument, however, is without merit in view of the Court's specific recognition in *Adarand* of the "special deference" accorded to the political branches in immigration matters, citing *Hampton I.* [84]

Because the Court referred only to immigration in its parenthetical characterization of *Hampton I,* it might be contended that "special deference" is appropriate only in cases within Congress' immigration power. Such an argument would be mistaken.

*Adarand* cited footnote 21 of the *Hampton I* opinion for the proposition that the Court has given special deference to the political branches in certain areas. Note 21 refers to Congress' immigration power, but states also that "the power over aliens is of a political character and therefore subject only to narrow judicial review." *Hampton I,* 426 U.S. at 101–02 n. 21, 96 S.Ct. at 1904 n. 21. The *Adarand* Court's citation of this note thus demonstrates that the area of special deference extends not only to immigration, but more generally to the regulation of aliens. *See Mathews,* 426 U.S. at 84–85, 96 S.Ct. at 1894 ("The equal protection analysis also involves significantly different considerations because it concerns the relationship between aliens and the States rather than aliens and the Federal Government.").

**78.** *Id.* at 894 (footnote omitted) (citing *Mathews* ).

**79.** *Abreu* Mem. 12–16.

**80.** *Supra,* note 57.

**81.** The *Abreu* plaintiffs argue that *Duggan* was deciding incorrectly in that it misread *Mathews v. Diaz. (Abreu* Mem. 19 n. 12) This Court of course is bound to apply *Duggan.*

**82.** 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995).

**83.** *Id.* at 217, 115 S.Ct. at 2108 (quoting *Buckley v. Valeo,* 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976)). They rely also on the following statement in *Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1981): "[T]he Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the federal government."

**84.** 515 U.S. at 217–18, 115 S.Ct at 2108.

■ Plaintiffs' final argument with respect to the standard of review is the contention that the severity of the deprivations that Section 402 would inflict upon them makes intermediate scrutiny appropriate even if the Court declines to subject the statute to strict scrutiny. The *Abreu* plaintiffs rely chiefly on *Plyler* and the City plaintiffs chiefly on two district court decisions, *Yuen v. I.R.S.* [85] and *Mow Sun Wong v. Hampton ("Hampton II")*.[86]

*Plyler* simply is inapposite here. The Supreme Court there applied intermediate scrutiny to strike down a Texas statute denying illegal immigrant children a free public education, reasoning that education was vitally important and that the children upon whom the statute operated rationally could not be blamed for their unlawful presence in this country. But *Plyler* dealt with state legislation. It did not even arguably suggest than any heightened level of scrutiny would govern the analysis of acts of Congress, much less that *Mathews* no longer controlled that issue.[87]

Unlike *Plyler, Yuen* and *Hampton II* both dealt with federal law, *Yuen* with a federal statute that limited eligibility for federal employment to citizens and certain noncitizens and *Hampton II* with a presidential executive order barring aliens from the civil service. The district court in *Yuen* sustained the statute, holding that it was subject to scrutiny more demanding than the rational basis test because it affected a liberty rather than a property interest and because the measure was not directly related to immigration.[88] In *Hampton II*, the district court applied a heightened standard of review on the same ground, coupled with the added theory that aliens are a "discrete and insular" minority, but nevertheless upheld the executive order.[89] *Yuen* and *Hampton II* nevertheless provide the plaintiffs with little support.

As an initial matter, *Yuen* and *Hampton II* are not the law of this Circuit. While *Yuen* was affirmed by the Second Circuit, the Court of Appeals went out of its way to avoid approving of the district court's application of a heightened standard of review, writing that it saw:

"no need to decide which standard of review was required here. Even under the intermediate review used by the district court, we find no error in the conclusion that the statute furthers important governmental interests." [90]

When the issue of the standard of review proper in such cases was presented two years later in *Duggan*, the Court, as we have seen, unambiguously held that only minimal scrutiny applies to federal alienage classifications, invalidating the district court's view in *Yuen* that heightened scrutiny is appropriate in certain cases. Thus, this Court is free to apply neither *Yuen* nor *Hampton II* in this respect.

85. 497 F.Supp. 1023 (S.D.N.Y.1980), *aff'd,* 649 F.2d 163 (2d Cir.1981), *cert. denied,* 454 U.S. 1053, 102 S.Ct. 597, 70 L.Ed.2d 588 (1981).

86. 435 F.Supp. 37 (N.D.Cal.1977), *aff'd sub nom., Mow Sun Wong v. Campbell,* 626 F.2d 739 (9th Cir.1980), *cert. denied sub nom., Lum v. Campbell,* 450 U.S. 959, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981).

87. Plaintiffs find support for heightened scrutiny also in *Plyler*'s suggestion that the Court has "held that the Fifth Amendment protects aliens whose presence in this country is unlawful from invidious discrimination by the federal government." *Plyler v. Doe,* 457 U.S. 202, 210, 102 S.Ct. 2382, 2391, 72 L.Ed.2d 786 (1982) (citing *Mathews* ). Plaintiffs misinterpret this reference, however. *Mathews* made clear that "[t]he fact that an Act of Congress treats aliens differently from citizens does not in itself imply that the such disparate treatment is invidious." As

*Hampton I* explained, some "overriding national interests" justify federal legislation under the Fifth Amendment which would violate equal protection under the Fourteenth Amendment. *Hampton I,* 426 U.S. at 100, 96 S.Ct. at 1904. *Mathews* explains that the regulation of aliens is one of these interests. Moreover, contrary to the suggestion in *Plyler, Mathews* never held that aliens are entitled to protection from "invidious discrimination by the federal government." In listing the rights guaranteed to aliens by the Fifth and Fourteenth Amendments, the Court referred only to protection "from deprivation of life, liberty, or property without due process of law." *Diaz,* 426 U.S. at 77, 96 S.Ct. at 1890.

88. 497 F.Supp. at 1039–40.

89. 435 F.Supp. at 43–44.

90. *Yuen v. IRS,* 649 F.2d 163, 168 (2d Cir.1981).

814

Even were this Court writing in the absence of *Duggan*, the rationale advanced by *Yuen* and *Hampton II* for their application of heightened scrutiny would be unpersuasive here. Both cases involved eligibility for federal employment, which was characterized as a liberty interest. That was the basis on which both courts sought to distinguish *Mathews v. Diaz*.[91] Plaintiffs' claim to eligibility for welfare benefits, however, is not even arguably characterized as a liberty interest. In consequence, neither *Yuen* nor *Hampton I* affords a basis for distinguishing *Mathews* in this case.[92]

Plaintiffs seek to surmount this obstacle by arguing that *Yuen* and *Hampton II* contemplated heightened scrutiny in cases involving the denial of any important interest. But there is no support in *Yuen* or *Hampton II* for the proposition that anything other than a liberty interest would warrant heightened scrutiny. More basically, what plaintiffs advocate is essentially a balancing test in which the level of scrutiny would be adjusted in each case depending upon "the importance of the benefit denied and the nature of the federal government interest."[93] However, *Hampton II*, upon which plaintiffs rely in

support of this argument, specifically disapproved of such a test. "[W]e do not believe that the [*Mathews*] Court meant to suggest that in each case the court is to independently balance the federal interest at stake against the deprivation involved."[94] Moreover, such an approach would set courts adrift on a sea of *ad hoc* decision making without the guidance of firm and neutral principles of adjudication.

Finally, plaintiffs assert that rational basis scrutiny is appropriate only where (1) "the classification impacts upon who shall be admitted to the country and who shall remain," and (2) the affected aliens lack "substantial connections" to this country.[95] In light of the preceding discussion, the first proposition simply is unsupportable. Plaintiffs' second assertion also lacks merit in the context of an equal protection challenge. Although some cases outside of the equal protection context contain language which suggests that aliens may acquire broader constitutional protection as they develop more substantial connections to this country, plaintiffs cite no authority for the application of such a principle in the equal protection context.[96]

91. *Yuen*, 497 F.Supp. at 1039; *Hampton II*, 435 F.Supp. at 43.

92. *Yuen* and *Hampton I*, moreover, in this Court's view rest on a questionable interpretation of *Hampton I*. In *Hampton I*, the Supreme Court stated that "some judicial scrutiny of the [due process] deprivation is mandated by the Constitution." 426 U.S. at 103, 96 S.Ct. at 1905 (emphasis added). Both district courts took this to mean that heightened scrutiny might be appropriate. *Yuen*, 497 F.Supp. at 1039; *Hampton II*, 435 F.Supp. at 43. In light of the *Hampton I* Court's statement that "the power over aliens is of a political character and therefore ... subject only to narrow review," *Hampton I*, 426 U.S. at 102 n. 21, 96 S.Ct. at 1904 n. 21, this Court believes that the Supreme Court was not inviting heightened scrutiny.

93. *City* Mem. 20–21.

94. *Hampton II*, 435 F.Supp. at 44 n. 7.

95. *Abreu* Mem. 18.

96. Plaintiffs rely heavily on *United States v. Verdugo–Urquidez*, 494 U.S. 259, 271, 110 S.Ct. 1056, 1064, 108 L.Ed.2d 222 (1990), for the proposition that "aliens receive constitutional protections when they have come within the territory of the United States and developed sub-

stantial connections with this country." *Id.* They argue that this statement establishes that an alien receives all the constitutional protections accorded citizens as he or she develops more substantial ties with the United States. This is an incorrect reading of *Verdugo–Urquidez*.

As an initial matter, the Court specifically explained that this principle applies only to "certain constitutional rights." *Id.* at 270, 110 S.Ct. at 1064. Moreover, the Court made very clear that whatever constitutional rights do vest in aliens as they establish substantial ties with this country, equal protection is not among them. In rejecting a claim that treating aliens differently from citizens violated equal protection, the Court explained that:

"the very cases previously cited with respect to the protection extended by the Constitution to aliens undermine this claim. They are constitutional decisions of this Court expressly according differing protection to aliens than to citizens, based on our conclusion that the particular provisions in question were not intended to extend to aliens in the same degree as citizens." *Id.* at 273, 110 S.Ct. at 1065 (citing *Mathews* ).

Thus, whatever *Verdugo–Urquidez* may say about aliens' connections with this country and the rights arising therefrom, it clearly did not intend its discussion to affect the established federal alienage jurisprudence exemplified by *Mathews*.

In the last analysis, none of the arguments advanced by plaintiffs warrants the application of a level of review more exacting than the rational basis test. Accordingly, the Court turns to the application of that standard to Section 402.

## B. Rational Basis Review

As the Supreme Court repeatedly has explained, rational basis review is not demanding:

"[A] classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Further, a legislature that creates these categories need not actually articulate at any time the purpose or rationale supporting its classification. Instead a classification must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." [97]

Review is the same in the context of immigration or alienage legislation.

"When the Federal Government asserts an overriding national interest as justification for a discriminatory rule which would violate the Equal Protection Clause if adopted by a state, due process requires that there be a legitimate basis for presuming that the rule was actually intended to serve that interest.... [I]f the rule were expressly mandated by the Congress or the President, we might presume that any interest which might rationally be served by

that rule did in fact give rise to its adoption." [98]

### 1. Legitimate Government Interest—Interests Appropriately Considered

The government identifies four purposes which, it claims, Section 402 serves: (1) giving aliens an incentive to become naturalized United States citizens; (2) encouraging noncitizens to be self-sufficient and to rely on families, sponsors, and private agencies; (3) controlling the escalating cost of the SSI program; and (4) diminishing the incentive for immigration created by the possible availability of benefits. [99]

The Court is met at the outset with a dispute as to which of these alleged purposes may be considered. While plaintiffs do not dispute that a legislature need not "actually articulate at any time the purpose or rationale supporting its classification," [100] they nevertheless argue that only the second and third purposes advanced by the defendants properly may be considered in this analysis because only they were specifically referred to by Congress in the Welfare Reform Act. They maintain that once a legislature elaborates on its motivation, a court may consider only its stated purposes. They rely for this proposition on *Zobel v. Williams*, [101] where the Court, after quoting the statement of purposes contained in the challenged statute, remarked that it therefore "need not speculate as to the objectives of the legislature." [102]

As an initial matter, plaintiffs' argument is unpersuasive because the statement in *Zobel* is not a prohibition on looking beyond a statute's stated purposes. The phrase "need not speculate" neither means nor connotes "must not speculate." Moreover, plaintiffs' argument is contrary to settled law. The Supreme Court often has stated that it is " 'constitutionally irrelevant whether [stated] reasoning in fact underlay the legislative de-

**97.** *Heller v. Doe*, 509 U.S. 312, 319–20, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993) (internal quotations and citations omitted).

**98.** *Hampton I*, 426 U.S. at 103–04, 96 S.Ct. at 1905.

**99.** Def. Mem. 26–27.

**100.** *Nordlinger v. Hahn*, 505 U.S. 1, 15, 112 S.Ct. 2326, 2334, 120 L.Ed.2d 1 (1992).

**101.** 457 U.S. 55, 102 S.Ct. 2309, 72 L.Ed.2d 672 (1982)

**102.** *Id.* at 61 n. 7, 102 S.Ct. at 2313 n. 7.

cision.' " [103] If it is immaterial whether Congress actually was motivated by a stated purpose, *a fortiori* it is immaterial whether Congress included a possible justification in a list of stated purposes. Finally, plaintiffs' argument is belied by *U.S. Dept. of Agriculture v. Moreno,* [104] where the Court considered several purposes not included in the purpose statement contained in the statute at issue. [105] This Court therefore concludes that all four of the interests advanced by the defendants are properly considered in this analysis.

### 2. Rational Relationship to Legitimate Interests

The standard for finding a rational relationship between a classification and a legitimate government purpose is generous. As the Court explained in *Dandridge v. Williams;* [106]

> "If the classification has some 'reasonable basis,' it does not offend the Constitution because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.' *Lindsley v. Natural Carbonic Gas Co.,* 220 U.S. 61, 78 [31 S.Ct. 337, 340, 55 L.Ed. 369] ... 'A statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.' *Metropolis Theatre Co. v. City of Chicago,* 228 U.S. 61, 69–70 [33 S.Ct. 441, 443, 57 L.Ed. 730]." [107]

In applying the rational basis test, it is important to focus on exactly what classification is at issue. As indicated previously, Section 402 distinguishes between two groups: (1) citizens, veterans and certain military personnel and the families of each, and legal resident aliens who have worked 40 qualifying quarters, on the one hand, and (2) other aliens on the other. The proper focus therefore is not on any pure distinction between citizens and aliens. It is, as in *Mathews,* on the line drawn by Congress between two groups of aliens, one of which is eligible for benefits and the other of which is not.

#### a. Encouraging Naturalization

In considering the propriety of limiting eligibility for federal employment to citizens, the Supreme Court in *Hampton I* assumed that there is a legitimate "national interest in providing an incentive for aliens to become naturalized." [108] Although the comment was not a holding in that case, the legitimacy of this interest subsequently has been recognized by many federal courts. [109] This Court too has little doubt that the encouragement of naturalization is a legitimate governmental objective. The question then is whether Section 402—in particular, its distinction between two groups of aliens—is rationally related to that end.

Citizenship is a relationship between a nation and an individual that has two characteristics. One is essentially legal and is defined by the protection conferred by the state on the citizen and by the duties owed by the citizen to the state. [110] The other is a rela-

---

**103.** *United States Railroad Retirement Board v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980) (quoting *Flemming v. Nestor,* 363 U.S. 603, 612, 80 S.Ct. 1367, 1373, 4 L.Ed.2d 1435 (1960)).

**104.** 413 U.S. 528, 533–38, 93 S.Ct. 2821, 2825–27, 37 L.Ed.2d 782(1973).

**105.** *See also Florida Bar v. Went For It, Inc.,* 515 U.S. 618, 624, 115 S.Ct. 2371, 2376, 132 L.Ed.2d 541 (1995) ("Unlike rational basis review, [other standards of review do] not permit us to supplant the precise interests put forward by the State with other suppositions.")

**106.** 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

**107.** *Id.* at 486, 90 S.Ct. at 1179.

**108.** *Hampton I,* 426 U.S. at 105, 96 S.Ct. at 1906.

**109.** *See, e.g., Campos v. FCC,* 650 F.2d 890, 894 (7th Cir.1981); *Mow Sun Wong v. Campbell,* 626 F.2d 739, 745 (9th Cir.1980), *cert. denied,* 450 U.S. 959, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981); *Jalil v. Campbell,* 590 F.2d 1120, 1122–23 (D.C.Cir.1978); *Vergara v. Hampton,* 581 F.2d 1281, 1287 (7th Cir.1978), *cert. denied,* 441 U.S. 905, 99 S.Ct. 1993, 60 L.Ed.2d 373 (1979); *Yuen,* 497 F.Supp. at 1039; *Lopez v. Bergland,* 448 F.Supp. 1279, 1283 (N.D.Cal.1978) (three judge court); *Santin Ramos v. US. Civil Service Commission,* 430 F.Supp. 422, 424 (D.P.R.1977) (three judge court).

**110.** Note, *The Functionality of Citizenship,* 108 HARV. L. REV. 1814, 1815 (1997) (hereinafter *Harvard Note* ).

**817**

tionship of affinity, one of shared "loyalties, civic allegiance, and national character." [111] In the case of naturalized citizens, who choose the object of their allegiance, it is a relationship involving an emotional and psychological commitment to the nation which in some instances may be as deep or deeper than that of those who acquire citizenship by birth.

In concluding that the encouragement of naturalization is a legitimate governmental interest, courts in substance have held that promotion of both of the ties between individual and nation that are represented by citizenship—legal ties, including importantly the right to participate fully in our political life, as well as the relationship of affinity described above—is a desirable end. Citizenship of course is the only status that permits an individual to vote and participate fully in the polity. But citizenship, Congress reasonably might conclude, is not the only means by which an individual may acquire or demonstrate loyalty, civic commitment and involvement with our national character. Military service long has been viewed as an experience that tends to integrate immigrants into our society and create and evidence affinity for our nation. And while the conclusion certainly is not irresistible, the same reasonably might be thought of the experience of working for ten years in qualifying—*i.e.,* "on the books"—employment. Thus, while lawful resident alien veterans, military personnel and long-time members of the work force are unlike citizens in that they have no rights of political participation, Congress could have regarded them as having the desired ties of affinity to the national community to a degree greater than other permanent aliens whose experiences in our country, as a broad generalization, have been more limited. As the Court explained in *Mathews:*

"it is unquestionably reasonable for Congress to make an alien's eligibility [for benefits] depend on both the character and duration of his residence. Since neither requirement is wholly irrational, this case essentially involves nothing more than a claim that it would have been more reasonable for Congress to select somewhat different requirements of the same kind." [112]

There are, to be sure, counter arguments, both as to the end and the means. Whether it is desirable to promote the naturalization of aliens perhaps more motivated towards citizenship by eligibility for welfare benefits than by commitment to our ideals and to becoming fully participating members of our society might well be debated.[113] Whether, even conceding the objective, Congress has drawn the line in exactly the right place by preserving SSI and food stamp eligibility for alien veterans and military personnel and their families and for those who have worked on the books for at least ten years while cutting off all others also reasonably might be questioned. However, "[t]he task of classifying persons for ... benefits ... inevitably requires that some persons who have an almost equally strong claim to favored treatment be placed on different sides of the line; the differences between the eligible and the ineligible are differences in degree rather than differences in the character of their respective claims." [114] The positioning of the line is precisely the sort of judgment that the Constitution commits to the political branches rather than the judiciary. As Congress cannot be said to have acted unreasonably in drawing a line between citizens and the permanent resident aliens unaffected by Section 402, on the one hand, and all other resident aliens on the other, and as Section 402 manifestly creates a powerful economic incentive for the latter group to naturalize,[115] this

111. *Id.*

112. *Mathews,* 426 U.S. at 83, 96 S.Ct. at 1893.

113. It has been argued cogently that legislation that creates an incentive to naturalize in order to qualify for welfare, or other tangible benefits,promotes naturalization for functional reasons at the expense of ties of national identity which historically have been the chief object of naturalization. *Harvard Note,* 108 HARV. L. REV. at 1825–26.

114. *Mathews,* 426 U.S. at 83–84, 96 S.Ct. at 1893.

115. The press is filled with reports of a flood of naturalization applications motivated by a desire to preserve eligibility for welfare benefits. *E.g.,* Karen McAllister, *Hundreds Receive U.S. Citizenship: Some Immigrants Say They Wanted to Ensure They Wouldn't Lose Benefits,* Fresno Bee, July 15, 1997, at A1; *New–Citizen Rolls Explode to 1.8 Million: Increase Believed to Be Linked to*

Court holds that the challenged classification is rationally related to the legitimate federal interest in promoting naturalization.

### b. Encouraging Self–Sufficiency

As one Member of Congress explained in advocating Section 402, "[p]erhaps the most fundamental requirement of America's immigration policy is that immigrants be self-reliant, not dependant on the American taxpayer for support." [116] The legitimacy of this object has been recognized since the earliest judicial consideration of immigration matters. [117]

■ Congress rationally could have concluded that those lawful resident aliens with long records of qualifying work, or who have served this country in the armed services, have demonstrated commitments to self-sufficiency and to caring for themselves and their families, if able, to a greater degree than those lacking these backgrounds. Thus, although reasonable people might come to a different conclusion, the Court cannot say that it was irrational for Congress to conclude that such persons, once having been placed on welfare rolls, would be more likely to leave them than others given any alternative to continued dependence on the public fisc. Hence, the distinction between those aliens affected by Section 402 and those who are not is rationally related to the stated Congressional goal. Moreover, Congress certainly had a rational basis for distinguishing between this group and other aliens as a means of rewarding military service and encouraging aliens to work "on the books," and thus to contribute to the Social Security System, in order to compile the requisite duration of qualifying employment.

*Anxiety Over Possible Loss of Benefits*, Fresno Bee, July 5, 1997, at A5.

**116.** 142 CONG. REC. H7757 (July 17, 1996) (Rep. Smith). *See also* Welfare Reform Act § 400(2)(A), 8 U.S.C. § 1601(2)(A) ("It continues to be the immigration policy of the United States that ... aliens within the Nation's borders not depend on public resources to meet their needs ...")

**117.** *See The Chinese Exclusion Case (Chae Chan Ping v. United States)*, 130 U.S. at 608, 9 S.Ct. at

### c. Fiscal Savings

■ One of the stated objectives of Section 402 was to reduce the strain on the federal budget by ending SSI benefits for most aliens. [118] That the statute effects, or reasonably may be thought to effect, cost savings is undisputed. The only controverted issues are whether the objective in this context is a legitimate one and the particular line drawn appropriate.

In upholding the exclusion of many lawful aliens from eligibility for participation in Medicare Part B, the Supreme Court relied solely on Congress' interest in "maintaining the fiscal integrity of the Medicare Part B program," [119] thus establishing the legitimacy of such economic considerations as factors in determining the eligibility of aliens for federal benefits. The Court went on to make clear that Congress has great latitude in determining where to draw the lines that must be drawn in all such cases:

> "We may assume that the [ten]-year line drawn by Congress is longer than necessary to protect the fiscal integrity of the program. We may also assume that unnecessary hardship is incurred by persons just short of qualifying. But it remains true that some line is essential, that any line must produce some harsh and apparently arbitrary consequences, and of greatest importance, that those who qualify under the test Congress has chosen may reasonably be presumed to have a greater affinity with the United States than those who do not." [120]

In this case, Congress was entitled to conclude that those aliens affected adversely by Section 402 have less substantial connections with and affinity for this country than those who remain eligible for benefits—the veter-

630–31 ("exclusion of paupers" is a legitimate aim).

**118.** Many of the statements in the legislative history are referred to in the defendants' brief at 27.

**119.** *Mathews*, 426 U.S. at 83 n. 22, 96 S.Ct. at 1893 n. 22; *see also id.* at 83, 96 S.Ct. at 1893.

**120.** *Id.* at 83, 96 S.Ct. at 1893.

ans and military personnel and their families and the longstanding members of the work force. As "[t]he decision to share [the nation's] bounty with our guests may take into account the character of the relationship between the alien and this country," [121] the line Congress drew here was rational.

#### d. Removing an Incentive for Immigration

 Given what has been said above concerning Congress' power over immigration, discouraging immigration to the United States plainly is a legitimate governmental purpose. Congress, moreover, was entitled to believe that persons might be encouraged to immigrate by the availability of welfare benefits.[122] There thus can be no serious dispute that eliminating welfare benefits for those who enter the country in the future as a means of discouraging immigration, both legal and illegal, is well within Congress' prerogative. The harder question is whether cutting off benefits to some aliens already lawfully in the country, as Section 402 does, is rationally related to the concededly legitimate end.

In seeking to defend Section 402 as rationally related to deterring immigration, the defendants argue that Congress wished to eliminate welfare benefits as a "magnet" for immigration.[123] They are silent, however, on the issue at hand, which is whether Congress rationally could have thought that cutting off benefits to those who already had lawful resident status would further the goal. One would think that cutting off benefits to those admitted to lawful resident status after the effective date of the Act would suffice to make clear to those wishing to come to the United States that they will be ineligible for welfare benefits should they do so.

The only justification that suggests itself is the argument that the Draconian quality of

termination of benefits to those who came here lawfully and then suffered reverses in their lives of the dimensions necessary to qualify for SSI and food stamps, only to find that the rules governing eligibility had changed, itself discourages immigration. In view of the fact that the statute is rationally related to other legitimate governmental objectives, the Court need not determine whether this is a sufficient justification for Section 402 as applied to these plaintiffs.

#### 3. Application to the Plaintiffs

 The plaintiffs contend also that the statute is unconstitutional because it does not serve its purpose with respect to the plaintiffs themselves. They argue, for example, that this group of aged, impoverished, and blind or disabled people cannot be expected to naturalize or to become self-sufficient. Surely they cannot be deterred from coming to the United States, as they are here already.

Plaintiffs' factual argument has some appeal. It would be foolish indeed to expect, for example, that certain of these plaintiffs ever could support themselves again. On the other hand, the factual argument is not nearly as compelling as plaintiffs would have it. Many of them, for example, have applied or intend to apply for citizenship [124] But the more basic difficulty with plaintiffs' argument is legal, not factual.

In *Dandridge v. Williams*,[125] the Supreme Court rejected precisely the argument plaintiffs make here. The plaintiffs in that case challenged a state statute that limited monthly welfare benefits to $250 per family, regardless of its size. The state defended the statute on the ground that it furthered its legitimate interest in encouraging employment. The plaintiffs rejoined that many of them were on welfare precisely because they were unemployable.[126] Nevertheless, the

---

**121.** *Id.* at 80, 96 S.Ct. at 1891–92.

**122.** *See, e.g., Graham v. Richardson*, 403 U.S. at 379, 91 S.Ct. at 1855 ("Alien residency requirements for welfare benefits necessarily operate ... to discourage entry into or continued residency in the state.")

**123.** Def. Mem. 29–30.

**124.** *Abreu* Am. Cpt. ¶¶ 58, 67, 77, 90; *City* Am. Cpt. ¶¶ 55, 63.

**125.** 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

**126.** *Id.* at 486, 90 S.Ct. at 1162.

Court upheld the statute on the ground that it provided an incentive to seek employment for at least some welfare recipients:

> "It is true that in some AFDC families there may be no person who is employable. It is also true that with respect to AFDC families whose determined standard of need is below the regulatory maximum, and who therefore receive grants equal to the determined standard, the employment incentive is absent. But the Equal Protection Clause does not require that a State must choose between attacking every aspect of a problem or not attacking the problem at all. *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 31 S.Ct. 337, 55 L.Ed. 369. It is enough that the State's action be rationally based and free from invidious discrimination. The regulation before us meets that test." [127] (parallel citations and footnote omitted).

Thus, a statute need not be rationally related to a legitimate governmental purpose as it applies to each individual. It is enough that Congress rationally might conclude that the statute, with all its imperfections, would serve a legitimate goal. That is the case here.

## II. Motion to Dismiss

Plaintiffs maintain that there are material facts in dispute regarding the rationality of the relationship between Section 402 and Congress' purposes which preclude granting the defendants' motion to dismiss.[128] They argue that they can demonstrate the irrationality of Section 402 by proving that:

> "the availability of SSI and benefits has not been, and cannot be, a 'magnet' for immigration; that non-citizens now in receipt of SSI can turn to neither family, nor sponsors, nor charities, nor employment for support; that many class members will never be able to naturalize; and that most

---

**127.** *Id.* at 486–87, 90 S.Ct. at 1162.

**128.** *See Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 101–02, 2 L.Ed.2d 80 (1957).

**129.** *Abreu* Rpy. Mem. 34.

**130.** *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315, 113 S.Ct. 2096, 2102, 124 L.Ed.2d 211 (1993).

---

will certainly be unable to do so in time to prevent their destitution." [129]

Plaintiffs' argument is without merit, however, because none of the propositions it asserts is material.

It is axiomatic that "a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data." [130] Moreover, "those challenging the legislative judgment must convince the court that the legislative facts on which the classification is apparently based could not reasonably be conceived to be true by the governmental decision maker." [131] Thus, it would not avail plaintiffs to prove their assertions unless the Court were persuaded that Congress could not reasonably have believed otherwise. In other words, plaintiffs "cannot prevail so long as 'it is evident from all the considerations presented to [the legislature], and those of which we may take judicial notice, that the question is at least debatable.'" [132]

■ Plaintiffs cannot meet this heavy burden here. Whether and to what extent (1) aliens have been attracted to our shores by welfare benefits, (2) aliens previously receiving SSI benefits would turn in the wake of Section 402 to non-federal sources for support, or (3) alien SSI recipients will be able to naturalize reasonably might be debated. But the outcome of those debates would not affect the disposition of this case. Given the enormous immigration pressure the United States has experienced and the tremendous increase in the numbers and proportions of aliens receiving SSI benefits, Congress certainly was entitled to conclude that there has been a relationship between the availability of benefits to lawful resident aliens and the flow of immigrants to our shores. While many current non-citizen SSI recipients may be unable to naturalize or

---

**131.** *Vance v. Bradley*, 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979):

**132.** *Minnesota v. Clover Leaf Creamery Co.*, 449 U.S. 456, 464, 101 S.Ct. 715, 724, 66 L.Ed.2d 659 (1981) (quoting *United States v. Carolene Products Co.*, 304 U.S. 144, 153–54, 58 S.Ct. 778, 784, 82 L.Ed. 1234 (1938)).

find other sources of support, plaintiffs' use of the word "many" in describing those individuals necessarily implies a concession that "some" will do so. That is all that is required under *Dandridge* and its progeny.

As plaintiffs cannot prove any facts under their complaints that would entitle them to relief on their claim that Section 402 of the Welfare Reform Act is unconstitutional, those claims are dismissed.

### III. Retroactivity

Section 402 was enacted on August 22, 1996. The SSA has determined that "aliens with claims and appeals of denied claims [as of August 22, 1996] are subject to the eligibility rules [of Section 402] for the entire period in the life of the application, including the months before August 1996."[133] Put in plain English, the SSA proposes to withhold the payment of benefits for periods prior to August 22, 1996 to lawful permanent residents whose applications had not yet been granted even if they were qualified under the eligibility rules applicable during those periods.

Plaintiffs claim that the SSA's action is invalid because it (a) applies Section 402 retroactively in contravention of *Landgraf v. USI Film Products*,[134] and (b) was promulgated in violation of the Administrative Procedure Act.[135] They ask this Court to enjoin enforcement of the SSA's policy. Defendants move to dismiss this claim.

### The Preliminary Injunction Standard

■ In order to enjoin government action taken pursuant to a statutory scheme, the movant must "demonstrate irreparable harm and a likelihood of success on the mer-

its."[136] If the injunction would alter the *status quo* or provide the movant with substantially all of the relief to which the movant would be entitled were the movant to prevail in the action, the movant must make a "clear" or "substantial" showing of a likelihood of success on the merits.[137]

■ Here, the threat of irreparable injury is manifest. Persons who establish eligibility for SSI benefits and food stamps are living at society's edge, well below the poverty line. While welfare benefits are money or money's equivalent, their denial almost universally has been regarded as irreparable injury because welfare recipients depend upon them not merely as a convenient medium of exchange, but to sustain life.[138] Indeed, the government does not argue otherwise, confining itself to contesting plaintiffs' position on the merits.[139] Moreover, while one might debate the issue whether the injunction sought here is properly characterized as mandatory or prohibitory, and therefore which of the two standards applies, the issue is immaterial because one of the plaintiffs has demonstrated a clear likelihood of success on the claim that SSA's proposed application of Section 402 is improperly retroactive.

### The Merits

#### 1. Jurisdiction

Two jurisdictional issues must be dealt with before considering the substance of plaintiffs' retroactivity argument.

■ First, in view of Section 205(g) of the Social Security Act,[140] only those individuals

---

**133.** SSA Program Operations Manual System SI 00502.150, *SSI Eligibility for Aliens Receiving Benefits on 8/22/96* ¶A.2 (appended to Def. Rpy. Mem.).

**134.** 511 U.S. 244, 263, 114 S.Ct. 1483, 1496, 128 L.Ed.2d 229 (1994). *See also Lindh v. Murphy,* —— U.S. ——, ——–——, 117 S.Ct. 2059, 2061–65, 138 L.Ed.2d 481 (1997).

**135.** 5 U.S.C. § 551 *et seq.* (1996).

**136.** *Jolly v. Coughlin,* 76 F.3d 468, 473 (2d Cir. 1996); *see also Molloy v. Metropolitan Transp. Authority,* 94 F.3d 808, 811 (2d Cir.1996); *New York Urban League v. State of New York,* 71 F.3d 1031, 1036 (2d Cir.1995).

**137.** *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.,* 60 F.3d 27, 33–34 (2d Cir.1995); *Jolly v. Coughlin,* 76 F.3d at 473.

**138.** *E.g., State of New York v. Sullivan,* 906 F.2d 910, 918 (2d Cir.1990); *Whelan v. Colgan,* 602 F.2d 1060, 1062 (2d Cir.1979).

**139.** Def. Mem. 48–49.

**140.** 42 U.S.C. § 405(g). *See, e.g. Califano v. Yamasaki,* 442 U.S. 682, 701, 99 S.Ct. 2545, 2557–58, 61 L.Ed.2d 176 (1979); *Mathews,* 426 U.S. at 75, 96 S.Ct. at 1889. Section 205(g) applies to claims for SSI benefits by virtue of 42 U.S.C. § 1383(c)(3).

who apply for, but do not receive, SSI benefits for the period prior to August 22, 1996 may challenge the SSA's policy. None of the individual plaintiffs in the *City* action and only plaintiff Piedad Gonzalez in the *Abreu* action falls into that category. Hence, the rest of the individual plaintiffs are unlikely to prevail on this claim. Indeed, this claim must be dismissed as to them.[141]

Second, the defendants contest the right of The City of New York to challenge the SSA policy. They argue that the Court has no jurisdiction to entertain the City's claim.

█ If the City's claim were construed as a claim for benefits, there manifestly would be no jurisdiction. Section 205(g) of the Social Security Act permits suits for benefits only after presentation of an application for them.[142] As the City has not presented, and cannot present, an application for benefits, it does not come within Section 205(g).

█ A second possible characterization of the City's claim depends upon the fact that the City is party to an interim assistance reimbursement agreement with the SSA pursuant to which the City provides interim assistance to SSI applicants and then is reim-

bursed by the SSA when applications are granted.[143] One formulation of the City's position therefore would be as a claim that the SSA's position violates the City's rights under the agreement. Judicial review of such claims, however, is expressly barred by 42 U.S.C. § 1383(g)(5).[144]

█ There is, however, another basis for the City's position. The City argues that it is injured in fact by the SSA's actions, that those actions violate the Administrative Procedure Act, and that this Court therefore has federal question jurisdiction over its claim. While the United States enjoys sovereign immunity and therefore may be sued only to the extent that it so consents,[145] the 1976 amendment to Section 10(a) of the Administrative Procedure Act[146] waived sovereign immunity in suits for judicial review of agency action in which, like this one, the relief sought is not money damages as long as no "other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." [147]

The defendants point to Section 205(h) of

---

**141.** It is important to note that plaintiffs seek relief only on behalf of those who not only sought benefits for periods before August 22, 1996, but applied prior to that date (*Abreu* Am. Cpt. ¶ 101 *City* Cpt. ¶ 100) Thus no question is raised here as to the retroactive application of Section 402 to those who apply after August 22, 1996 for benefits in respect of periods prior to that date.

**142.** 42 U.S.C. § 405(g); *Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 2557–58, 61 L.Ed.2d 176 (1979); *Mathews*, 426 U.S. at 75, 96 S.Ct. at 1889.

**143.** *See generally White v. Bowen*, 835 F.2d 974, 977–78 (2d Cir.1987).

**144.** *West v. Sullivan*, No. 92 Civ. 4024(PKL), 1993 WL 14472, at * (S.D.N.Y.1993).

**145.** *Lane v. Pena*, —— U.S. ——, ——, 116 S.Ct. 2092, 2096, 135 L.Ed.2d 486 (1996) (citing *United States v. Nordic Village, Inc.*, 503 U.S. 30, 33–34, 112 S.Ct. 1011, 1014–15, 117 L.Ed.2d 181 (1992)). Strictly speaking, the City's fourth and fifth causes of action in substance are brought against the acting commissioner of the SSA. A federal official, however, enjoys sovereign immunity except where the defendant "has acted in his individual capacity, or outside the scope of his authority, or when the officer, although within

the scope of his authority, acted unconstitutionally, or the power on which he based his conduct is unconstitutional. If none of these exceptions applies and there is no specific statute waiving immunity, jurisdiction is lacking and the suit must be dismissed." 14 CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE: JURISDICTION AND RELATED MATTERS § 3655, at 227–30 (1970).

Here the claims against the commissioner are that his interpretation of Section 402 of the Welfare Reform Act was (a) contrary to the statute and therefore arbitrary and capricious and an abuse of discretion, and (b) a substantive, legislative rule that was adopted without notice and comment, both in violation of the Administrative Procedure Act. (*City* Cpt. ¶¶ 99–106) No constitutional claim is asserted in this respect and there certainly is no contention that the acting commissioner acted in his individual capacity, outside the scope of his authority, or on the basis of a power conferred in violation of the Constitution. In consequence, he enjoys sovereign immunity to the same extent as the United States itself.

**146.** 5 U.S.C. § 702.

**147.** *Id.; Bowen v. Massachusetts*, 487 U.S. 879, 891–92, 108 S.Ct. 2722, 2730–31, 101 L.Ed.2d 749 (1988).

the Social Security Act,[148] which provides as follows:

> "The findings and decision of the Secretary after a hearing shall be binding upon all individuals who were parties to such hearing. No findings of fact or decision of the Secretary shall be reviewed by any person, tribunal, or governmental agency except as herein provided. No action against the United States, the Secretary, or any officer or employee thereof shall be brought under section 1331 or 1346 of Title 28 to recover on any claim arising under this subchapter."

They contend that the final sentence bars the City's claim.

This Court disagrees. Section 205(h) is part of the section of the Social Security Act that creates a process by which applicants whose benefit claims are rejected obtain administrative and, if need be, judicial review of such decisions.[149] The first two sentences of Section 205(h) clearly prescribe the effect that courts called upon to review administrative determinations of benefit claims must give to those administrative decisions. The purpose and effect of the third sentence, read in context, therefore is merely to require benefit claimants to pursue the administrative remedy that Congress created in Section 205(g) before resorting to litigation and thereafter to seek judicial review by the process spelled out in that section.[150] Section 205(h) therefore has no bearing on the City's claim, which does not seek benefits or judicial review of benefit determinations. Accordingly, the Court has jurisdiction over the City's fourth and fifth causes of action.

### 2. The Challenged Policy

*Landgraf* reaffirmed "the axiom that 'retroactivity is not favored in the law,' and its interpretive corollary that 'congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.'"[151] In providing a framework for determining the proper temporal application of a statute, the Court explained that:

> "[w]hen a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, i.e., whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result."[152]

Defendants argue that the SSA properly cut off benefits for periods prior to August 22, 1996 to those whose applications had not been granted by that date even if they qualified under the standards then in effect. They seek to defend this action on two theories.

---

148. 42 U.S.C. § 405(h).

149. *Id.* § 405(g).

150. *See Bowen v. Michigan Academy of Family Physicians,* 476 U.S. 667, 679–80, 106 S.Ct. 2133, 2140–41, 90 L.Ed.2d 623 (1986); *Cosgrove v. Sullivan,* 999 F.2d 630, 632 (2d Cir.1993); *United States v. Aquavella,* 615 F.2d 12, 19–21 (2d Cir.1979) ("the entire thrust of ... section [405(h)] is to prevent claimants from bypassing the specific procedural requirements provided by Congress in the various acts") (citing *Weinberger v. Salfi,* 422 U.S. 749, 757–59, 763–64, 95 S.Ct. 2457, 2462–64, 2465–66, 45 L.Ed.2d 522 (1975)); *Stieberger v. Heckler,* 615 F.Supp. 1315, 1338 n. 20 (S.D.N.Y.1985), *vacated on other grounds sub nom. Stieberger v. Bowen,* 801 F.2d 29 (2d Cir.1986); *Abrams v. Heckler,* 582 F.Supp. 1155,

1158 (S.D.N.Y.1984); *City of New York v. Heckler,* 578 F.Supp. 1109, 1119–22 (E.D.N.Y.), *aff'd,* 742 F.2d 729 (2d Cir.1984), *aff'd sub nom., Bowen v. City of New York,* 476 U.S. 467, 106 S.Ct. 2022, 90 L.Ed.2d 462 (1986).

151. *Landgraf,* 511 U.S. at 264, 114 S.Ct. at 1496 (quoting *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204, 208, 109 S.Ct. 468, 471, 102 L.Ed.2d 493 (1988)); *see Lindh,* —— U.S. at ——, 117 S.Ct. at 2062 (explaining that under *Landgraf* an "'unambiguous directive' is necessary to authorize 'retroactive application'") (quoting *Landgraf,* 511 U.S. at 263, 114 S.Ct. at 1496).

152. *Landgraf,* 511 U.S. at 280, 114 S.Ct. at 1505.

### (a) Congressional Intent

▮ Defendants argue first that Congress clearly mandated that Section 402's eligibility restrictions cover applications for benefits that had accrued prior to the date of its enactment. The argument is somewhat complex. The operative provision of Section 402 provides only that "[n]otwithstanding any other provision of law and except as provided in paragraph (2), an alien who is a qualified alien ... is not eligible for any specified Federal program (as defined in paragraph (3))." [153] Section 431 defines "qualified alien" as "an alien who, at the time the alien applies for, receives, or attempts to receive a Federal public benefit, is (1) an alien who is lawfully admitted for permanent residence."[154] Defendants maintain, therefore, that an applicant for SSI benefits must be eligible not only at the time of the application, but at the time the benefits are to be paid. Since any payments to lawful resident aliens after August 22, 1996 in respect of periods prior to that date would be made at a time when the aliens would not be eligible, the defendants contend, Congress intended Section 402 to operate retroactively.[155] The defendants argue, in effect, that one must be eligible for benefits under Section 402 to be a "qualified alien" under Section 431. The argument misconstrues the statute.

Section 431's function in the statute is to distinguish between two groups of aliens who applied for, received or attempted to receive federal benefits—those admitted for lawful permanent residence and those who are not.[156] It does not incorporate any limits on eligibility which are found in Section 402.

Section 402 provides that persons who are "qualified aliens" under Section 431 are not eligible for SSI and food stamps. In other words, it establishes that benefits can not be paid to aliens lawfully admitted for permanent residence who apply for, receive or attempt to receive benefits. The status of "qualified alien," however, does not depend on eligibility for benefits under Section 402.[157] Neither Section 402 nor Section 431 addresses the question whether a qualified alien's *eligibility* must be determined at the time of payment, using Section 402's new standards, or can be determined as of the time that the right to the payments accrued, using the eligibility criteria then applicable. These sections therefore do not evidence a clear and unambiguous Congressional intent that the cutoff is to take effect with respect to periods prior to August 22, 1996.

Defendants maintain also that Section 402 "prohibits" payment to aliens on and after the effective date of the statute.[158] In consequence, they argue, only those aliens covered by an exception may receive benefits after the effective date of the statute. It would draw support for this conclusion from Section 402(a)(2)(D),[159] which requires redetermination of the eligibility of those receiving benefits as of August 22, 1996. The argument is fundamentally misconceived. Nothing in Section 402 "prohibits" the payment of benefits after August 22, 1996 except in the sense that certain aliens are rendered ineligible as of that date, and certainly nothing prohibits the payment of benefits in respect of periods prior to that date during which the recipients were eligible under the criteria then in effect. Nor does the statute say anything about the standard to be applied to pending claims and appeals. Under *Landgraf*, this is insufficient to support the SSA's interpretation of Section 402.

### (b) The Nature of the SSA's Policy

▮ Alternatively, defendants argue that SSA's application of the statute in fact is not retroactive. They point out that "[a] statute does not operate 'retrospectively' merely because it is applied in a case arising from conduct antedating the statute's enactment,"

---

**153.** 8 U.S.C. § 1612(a)(1).

**154.** 8 U.S.C. § 1641(b).

**155.** Deft Rpy. Mem. 18–19.

**156.** 8 U.S.C. § 1641(b).

**157.** This is demonstrated also by Section 432, which distinguishes between "a qualified alien" and a person who "is eligible to receive such benefit [under Section 402]." 8 U.S.C. § 1642.

**158.** Def. Mem. 48.

**159.** 8 U.S.C. § 1612(a)(2)(D).

but concede that "new provisions affecting contractual or property rights," are retroactive when they reach rights that existed before the effective date of the provision.[160] Defendants contend that those who were not already receiving benefits as of August 22, 1996 had no vested right to do so with respect to periods prior to that date and that the SSA's interpretation is not retroactive because it deprived them of no vested property interest. The defendants' premise, however, is incorrect.

The Supreme Court has explained that "the normal meaning of entitlement includes a right or benefit for which a person qualifies, and it does not depend upon whether the right has been acknowledged or adjudicated. It means only that the person satisfies the prerequisites attached to the right." [161] A legitimate claim of entitlement to a government benefit therefore exists where a claimant satisfies the qualifications for the benefit and the granting official lacks discretion to reject a qualified applicant.[162]

This principle applies here. The SSA merely determines whether a claimant meets the requirements for benefits. It may not deny benefits to those who are qualified.[163] An applicant, moreover, is eligible for and paid benefits not from the date that his or her claim is adjudicated favorably, but from the date the circumstances giving rise to the claim first existed.[164] Thus, SSI claimants who in fact are eligible for the payment of benefits as of any given date have more than a mere expectation of receiving benefits. They have a legally protected right to accrued preadjudication benefits as, indeed, many courts have held.[165]

Whether Congress could deprive qualified SSI applicants of benefits for a prior period during which they qualified need not be addressed here. It is sufficient to decide this case to conclude that the SSA's action impairs rights that plaintiffs applied for, that existed under the Social Security Act and the regulations thereunder for periods prior to August 22, 1996 and that there is nothing in Section 402 that supports the conclusion that Congress so intended. Given the "traditional presumption" that a new statute will not be applied to impair existing rights "absent clear congressional intent favoring such a result," [166] this Court holds that Piedad Gonzalez has demonstrated a clear and substantial likelihood of success on her claim that the SSA improperly has applied Section 402 to claims and appeals of denied claims for SSI benefits applied for before, and accrued prior to, August 22, 1996.

160. *Landgraf,* 511 U.S. at 269, 114 S.Ct. at 1499.

161. *Estate of Cowart v. Nicklos Drilling Co.,* 505 U.S. 469, 477, 112 S.Ct. 2589, 2595, 120 L.Ed.2d 379 (1992); *see also Board of Regents v. Roth,* 408 U.S. 564, 577, 92 S.Ct. 2701, 2709, 33 L.Ed.2d 548 (1972) (property right existed despite the fact that the "recipients have not yet shown that they were, in fact, within the statutory terms of eligibility.").

162. *See, e.g. Sanitation and Recycling Industry, Inc. v. City of New York,* 107 F.3d 985, 995 (2d Cir.1997) (discretion of granting official key inquiry for entitlement analysis); *Crowley v. Courville,* 76 F.3d 47, 52 (2d Cir.1996) (same); *Zahra v. Town of Southold,* 48 F.3d 674, 680 (2d Cir. 1995) (same).

163. 42 U.S.C. § 1381a (Supp.1997) (every aged, blind, or disabled individual with a qualifying income and resources "shall" be paid benefits); *See* 20 C.F.R. § 416.203; *see also* 20 C.F.R. §§ 416.204—416.222 (1997). Moreover, every one of the myriad cases reviewing denials of *SSI* is based on the premise that benefits may be denied only if a person does not satisfy the statutory requirements. *See, e.g., Pratts v. Chater,* 94 F.3d 34, 37 (2d Cir.1996).

164. *See* 20 C.F.R. § 404.603(b) (1997). Indeed, the regulation states that applying for benefits will "[p]rotect [the claimant's] entitlement to any benefits that may be payable for as many as 6 months or 12 months ... before the application was filed." *Id.*

165. *See Daniels v. Woodbury County,* 742 F.2d 1128, 1132 (8th Cir.1984); *Teitelbaum v. Chater,* 949 F.Supp. 1206, 1211–12 (E.D.Pa.1996); *Miller v. Callahan,* 964 F.Supp. 939, 948–50 (D.Md. 1997); *see also Holbrook v. Pitt,* 643 F.2d 1261, 1278 n. 35 (7th Cir.1981) ("Applicants who have met the objective criteria of a wide variety of governmental programs have been held to be entitled to protection under the due process clause.") (citing cases); *but see Sousa v. Chater,* 945 F.Supp. 1312, 1329 n. 17 (E.D.Cal.1996) (ignoring "legitimate claim of entitlement" jurisprudence without explanation).

166. *Landgraf,* 511 U.S. at 280, 114 S.Ct. at 1505.

826

A preliminary injunction will issue.[167]

## IV. Class Certification

Plaintiffs in *Abreu* move to certify a Rule 23(b)(2) class consisting of all lawful permanent residents in New York, Connecticut and Vermont who (1) are or will be age 65 or older, blind, or disabled, (2) were residing in the United States on August 22, 1996, (3) either (i) were recipients of SSI on August 22, 1996, or (ii) are or will be applicants for SSI benefits, and (4) have been or will be disqualified from receiving SSI and food stamps by operation of Section 402. The motion is uncontested in all respects but one—defendants contend that the class may not properly include persons who have not applied for SSI benefits, arguing that non-applicants have not satisfied the jurisdictional requirement of presentment of a claim for benefits.[168]

This dispute is largely academic. Both sides agree that non-applicants may become class members upon presenting claims for benefits should the Court certify a class restricted to those who have applied for benefits.[169]

Accordingly, the Court certifies the class proposed by plaintiffs in the *Abreu* action save that the case, insofar as it challenges the application of Section 402 to claims in respect of periods prior to August 22, 1996, shall proceed as a class action only on behalf of those who have presented such claims to the SSA.[170]

## Conclusion

For more than two centuries, the United States has beckoned to those the world over who have sought a better life for themselves and their children. Countless numbers have come to our shores hoping to better their lots. While many have succeeded, the hopes of others, including many who have come legally and thus are guests in our nation, have succumbed to poverty, age, and disability. The hardship that Section 402 will inflict on these guests is undeniable. Under our Constitution, however, the responsibility for making judgments such as these rests principally with Congress. It is in Congress that this troublesome situation must be addressed.

The defendants' motion to dismiss the amended complaint in the City case (97 Civ. 2133) is granted with respect to Counts I, II, and III, and denied in all other respects. Their motion to dismiss the amended complaint in the *Abreu* case (97 Civ. 2126) is granted in all respects save that the motion is denied with respect to the second cause of action insofar as it is asserted on behalf of plaintiff Piedad Gonzalez and similarly situated members of the certified class.

The motion of the plaintiffs in the *Abreu* action to certify a class is granted to the extent that the action shall be maintained as a class action on behalf of all lawful permanent residents of New York, Connecticut and Vermont who (1) are or will be age 65 or older, blind or disabled; (2) were residing in the United States on August 22, 1996; (3) either (i) were recipients of SSI on August 22, 1996; or (ii) have applied for SSI benefits; and (4) have been or will be disqualified from receiving SSI and food stamp benefits by operation of Section 402 of the Welfare Reform Act.

Plaintiffs' motion for a preliminary injunction is granted to the extent that defendants are enjoined, pending the determination of

---

**167.** This conclusion makes it unnecessary to consider plaintiffs' argument under Section 4 of the Administrative Procedure Act, 5 U.S.C. § 553.

**168.** *See, e.g. Califano v. Yamasaki*, 442 U.S. 682, 701, 99 S.Ct. 2545, 2557–58, 61 L.Ed.2d 176 (1979); *Mathews*, 426 U.S. at 75, 96 S.Ct. at 1889.

**169.** Def. Rpy. Mem. 14; *Abreu* Rpy. Mem. 32.

**170.** Plaintiffs argue also that the Court has jurisdiction over non-applicants under the mandamus statute, 28 U.S.C. § 1361. However, mandamus is proper only where an official owes a non-discretionary duty to the petitioner. *See Pittston Coal Group v. Sebben*, 488 U.S. 105, 121, 109 S.Ct. 414, 424, 102 L.Ed.2d 408 (1988); *Heckler v. Ringer*, 466 U.S. 602, 612, 104 S.Ct. 2013, 2020, 80 L.Ed.2d 622 (1984). No duty to award SSI benefits exists unless and until a qualified person applies for such benefits. Thus, no non-discretionary duty is owed to non-applicants, and *mandamus is not a proper ground for jurisdiction over their claims.*

this action, from failing to pay SSI benefits for the period prior to August 22, 1996 to plaintiff Piedad Gonzalez and plaintiff class members who applied for benefits prior to August 22, 1996 and, but for their status as qualified aliens as defined in 8 U.S.C. § 1641, would be eligible for such benefits. It is denied in all other respects.

The foregoing constitute the Court's findings of fact and conclusions of law.

SO ORDERED.