Dr. Paul MAGUIRE, D.N., Dr. Rodolfo T. Abiera, D.N. and Dr. Anne F. Adukaitis, D.N., et al., Plaintiffs–Appellants,

v.

Robert C. THOMPSON, Acting Director of the Department of Professional Regulation, State of Illinois (and Successor in Public Office to Stephen F. Selcke) and Department of Professional Regulation, State of Illinois, Defendants–Appellees.

No. 90–3505.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 26, 1991.
Decided Feb. 26, 1992.

Gary L. Starkman (argued), Ross & Hardies, Marjorie E. McCollom, Francesca J. Robertson, and John J. Burke, Arvey, Hodes, Costello & Burman, Chicago, Ill., for plaintiffs-appellants.

Kathleen Kreisel Flahaven, Thomas A. Ioppolo, Asst. Attys. Gen., Office of the Atty. Gen., and Jennifer A. Keller, Asst. Atty. Gen. (argued), Office of the Atty. Gen., Civ. Appeals Div., Chicago, Ill., for defendants-appellees.

\* Honorable Albert J. Engel, Senior Circuit Judge for the United States Court of Appeals for the Sixth Circuit, sitting by designation.

Before CUDAHY and RIPPLE, Circuit Judges, and ENGEL, Senior Circuit Judge.\*

ENGEL, Senior Circuit Judge.

Naprapathy is defined as "a therapeutic system of drugless treatment by manipulation depending on the theory that disease symptoms result from disorder in the ligaments and connective tissues." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY (1971).

Paul Maguire and the other plaintiff doctors of naprapathy appeal from the district court's dismissal of their 42 U.S.C. § 1983 claim that the Illinois Medical Practice Act of 1987 deprives them of their federal constitutional rights to due process and equal protection. The plaintiffs assert that the Illinois General Assembly lacked a rational basis to exclude doctors of naprapathy from the licensing provisions of the Act, and seek an evidentiary hearing on the question. We affirm the district court's dismissal of their claims.

The Illinois Medical Practice Act of 1987 (the "MPA") establishes a licensing scheme for the practice of medicine and other healing arts in the State of Illinois. *See* ILL. REV.STAT., ch. 111, ¶¶ 4400-1—4400-63. To practice medicine, a person must possess a license. ILL.REV.STAT., ch. 111, ¶ 4400-3. The state will issue two types of licenses: a license to practice medicine, or a more limited license to treat human ailments without drugs or operative surgery. ILL.REV. STAT., ch. 111, ¶ 4400-11. The state requires a medical or osteopathic degree for the broader medical license, while the more restrictive license may be issued to those holding only a chiropractic degree. *Id.* The legislature penalizes those who practice medicine without one of these two licenses. ILL.REV.STAT., ch. 111, ¶¶ 4400-49— 4400-51, 4400-59.

All of the plaintiffs hold degrees in naprapathy. Naprapaths treat human ailments through manipulation of connective tissue. For example, one of the plaintiff

naprapaths treated a woman for neck and shoulder pain by manipulating her neck and shoulders. While Illinois now requires a person to possess a limited license to treat human ailments without drugs in order to practice naprapathy, it will not issue a license to someone holding only a degree in naprapathy. Instead, it requires naprapaths to gain further education in one of the approved medical fields.

The predecessor law to the MPA, the Illinois Medical Practice Act of 1923 did not restrict the ability of naprapaths to practice their healing art. Nor, on its face, did it authorize the licensure of naprapaths. But in 1987, a group of naprapaths won the right to be licensed under the Illinois Medical Practice Act of 1923. *Potts v. Department of Registration and Educ.*, 145 Ill. App.3d 960, 99 Ill.Dec. 678, 496 N.E.2d 253 (1987). Shortly thereafter, the General Assembly enacted the MPA, establishing educational requirements for medical licenses which exclude naprapaths.

Maguire and the rest of the plaintiffs filed suit under 42 U.S.C. § 1983, claiming that the Act violated their federal constitutional rights to due process and equal protection of the laws.[1] The plaintiffs sued the Director of the Department of Professional Regulation (the "Director") in his official capacity. The Director filed a Rule 12(b)(6) motion to dismiss for failure to state a claim. The district court granted the motion on *res judicata* grounds, finding the plaintiffs in an earlier state challenge to the legislation, *Potts v. Department of Registration and Education*, 128 Ill.2d 322, 131 Ill.Dec. 584, 538 N.E.2d 1140, *cert. denied*, 493 U.S. 992, 110 S.Ct. 540, 107 L.Ed.2d 537 (1989), to have been the virtual representatives of the plaintiffs in this case. Maguire then filed a Rule 59 motion to reconsider. The district court denied that motion, relying on the merits as well as *res judicata*, finding that the legislature had a rational basis for its licensing scheme.

We review Rule 12(b)(6) motions to dismiss *de novo* to determine whether under any set of facts the non-moving party could prevail. *Villegas v. Princeton Farms, Inc.*, 893 F.2d 919, 924–25 (7th Cir.1990). Maguire claims that the district court erred in dismissing the napraphaths' due process and equal protection challenges to the constitutionality of the Act's licensing provisions.

■ Unless a statute implicates a fundamental right or makes a suspect classification, to withstand fourteenth amendment scrutiny the law must bear only a rational relation to a legitimate state purpose. *See, e.g., Vance v. Bradley*, 440 U.S. 93, 97, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979); *City of New Orleans v. Dukes*, 427 U.S. 297, 303, 96 S.Ct. 2513, 2516, 49 L.Ed.2d 511 (1976) (per curiam); *Williamson v. Lee Optical Co.*, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955). Maguire challenges the MPA's differentiation by education between doctors of naprapathy and doctors of medicine, osteopathy and chiropractic. Like similar licensing schemes, this statute does not create suspect classifications, nor does it implicate fundamental rights. *See Illinois Health Care Ass'n v. Illinois Dep't of Public Health*, 879 F.2d 286 (7th Cir.1989); *Illinois Psychological Ass'n v. Falk*, 818 F.2d 1337 (7th Cir.1987); *Sutker v. Illinois Dental Soc'y*, 808 F.2d 632 (7th Cir.1986). Thus, as Maguire concedes, the statute should be evaluated to determine whether it violates either the due process or the equal protection clauses of the fourteenth amendment using the rational basis test.

When applying the rational basis test, the courts presume the constitutionality of the classification. *Dukes*, 427 U.S. at 303, 96 S.Ct. at 2516. This presumption places the onus of proving unconstitutionality on the plaintiff, who "must prove that the facts on which the legislature may have relied in shaping the classification 'could not reasonably be conceived to be true by the governmental decisionmaker.'" *Sutk-*

---

**1.** The plaintiffs originally claimed violations of the state constitution as well, but have since waived them.

*er,* 808 F.2d at 635, *quoting Vance v. Bradley,* 440 U.S. 93, 111, 99 S.Ct. 939, 949, 59 L.Ed.2d 171 (1979).

■ The MPA's licensing scheme seeks to protect the public from unqualified medical practitioners. While this purpose is legitimate, Maguire asserts that the educational classifications in the MPA do not rationally serve this purpose. The scheme allegedly violates due process by creating an arbitrary standard for the issuance of medical licenses. In support of their claim, plaintiffs claim that the legislature has never suggested a need to protect the public from naprapaths, nor did it conduct an investigation to determine whether naprapaths pose a danger to the public. Further, they urge that the additional statutory educational requirement to practice naprapathy is illusory because the classes taken to receive any of the degrees required to receive a license are largely irrelevant to naprapathy. Therefore, the MPA violates the due process clause.

Maguire also alleges a violation of the equal protection clause. This argument builds on the legislature's failure to conduct an investigation by citing the absence of a statistical or analytical justification in the legislative history for the educational distinctions. The legislature did not discredit naprapathy, but effectively prevented its practice by refusing to license those who possess only a degree in naprapathy. Also, the legislature abdicated its decision-making power by allowing other medical special interest groups to dictate the terms of the MPA, and thereby to exclude naprapaths because of an anticompetitive animus. Thus, the MPA sets out arbitrary and capricious standards, in violation of the fourteenth amendment right to equal protection.

■ We agree with the district court that the MPA violates neither the due process nor the equal protection provisions of the United States Constitution. As the district court noted, the details of the educational requirement indicate that the General Assembly considered the amount of education necessary to guarantee adequately trained doctors. While Maguire characterizes the additional education received by other types of doctors as "irrelevant," the General Assembly could have concluded that this level of education provides better training in theories of disease. *Dandridge v. Williams,* 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970). Logically, better training leads to better diagnosis and better treatment. While the naprapaths may have treated many people competently over the years, it is within the legislative prerogative to limit the practice of medicine to those who provide the safest service.

For example among the attachments to the plaintiffs' complaint is a flyer announcing a presentation by one of the plaintiffs, Dr. Verl Hunter on Tuesday, March 20, 1990 in Mt. Carmel. The flyer offers the opportunity to "learn about natural treatments for arthritis, diabetes, P.M.S. [premenstrual syndrome], T.M.J. [temporal mandibular joint], infertility, digestive disturbances, circulation problems, yeast infections, hyperactivity, prostate problems." The flyer further states that "Dr. Hunter specializes in herbology, homepathy [sic], acupuncture, manipulation of connective tissue." From representations such as this, from the possession of a doctor's degree and the title of "Doctor" employed by the plaintiffs, potential patients could, a legislature might rationally conclude, believe that the naprapath possessed skills far broader than those for which he or she was trained. While it might be unfair to believe that a naprapath would in fact engage in medical practice outside the field of naprapathy, the legislature could rationally conclude that a person afflicted with disease or other serious medical problems not treatable by naprapathy might be induced to postpone or even forego necessary medical treatment while undergoing treatment by a naprapath. It would even be rational for a legislature to conclude that the training offered in a school of naprapathy would in fact be inadequate for proper medical diagnosis and treatment and therefore people seeking treatment from those who hold only a degree in naprapathy run a serious risk of either misdiagnosis or non-diagnosis

of their ailment. Under the law as we perceive it and demonstrate in this opinion, it is not necessary to hold an evidentiary hearing either before the legislature or before the trial court to determine whether in fact such circumstances have existed nor is it necessary to demonstrate that the legislature in fact specifically articulated one or another such reasons as the basis for its action. It is enough under the cases to conclude as a matter of law that a legislature could have accepted such reasons and it is only necessary that the courts determine as a matter of law that they are rational in order to uphold the legislative action.

As the Supreme Court noted in *Lee Optical,* a health and safety reform "may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. The legislature may select one phase of one field and apply a remedy there, neglecting the others." *Lee Optical,* 348 U.S. at 489, 75 S.Ct. at 465. Finally, as we indicated in *Sutker,* "[i]t is the legislature's prerogative to determine which innovations in health care are acceptable risks and which are not." *Sutker,* 808 F.2d at 637. This determination does not require statistical studies, or even absolute logical consistency. "It is enough that there is an evil at hand for correction, and that it might be thought that the particular legislative measure was a rational way to correct it." *Lee Optical,* 348 U.S. at 488, 75 S.Ct. at 464.

Nor did the legislature act without knowledge of the field of naprapathy. Ten months prior to the passage of the MPA, *Potts v. Department of Registration and Education,* 145 Ill.App.3d 960, 99 Ill.Dec. 678, 496 N.E.2d 253 (1987), allowed for the licensing of naprapaths under the old law. *See Potts v. Department of Registration and Educ.,* 128 Ill.2d 322, 131 Ill.Dec. 584, 538 N.E.2d 1140, *cert. denied,* 493 U.S. 992, 110 S.Ct. 540, 107 L.Ed.2d 537 (1989). Further, at the time of the MPA's consideration, the Senators knew of a bill pending in the Illinois House to license naprapaths. 85TH GENERAL ASSEMBLY (May 14, 1987) (statement of Sen. Jones). This indicates that the legislature intended the effect of the law eventually passed.

Also, the silence of the MPA's legislative history does not provide sufficient basis for an evidentiary hearing to establish the lack of a rational purpose. The naprapaths seek this hearing to prove the benefits of their healing art. They again base their argument on the failure of the General Assembly to conduct investigations, hearings or any other discussion of the science of naprapathy. These failures indicate that the General Assembly could not have actually considered any of the rationales asserted by the court or the Director to justify the scheme in the MPA. Under these circumstances, Maguire asserts that the courts should not be allowed to hypothesize a rational basis for legislation. Instead, the court should conduct an evidentiary hearing where the naprapaths could prove that their actions pose no threat to the health and safety of the public.

While requiring the legislature to consider fully all of the implications of a law, to articulate the reasoning behind the enactment of a statute, and to remain free from the "taint" of special interest groups might arguably improve both the legislative process and the laws themselves, the failure to take these steps does not result in a violation of the Constitution. The fourteenth amendment requires a rational relationship to a legitimate state purpose, but it does not require that the legislature spell out its reasoning. *United States R.R. Retirement Bd. v. Fritz,* 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980) ("this Court has never insisted that a legislative body articulate its reasons for enacting a statute"). Mere participation by the public, including participation by both the American Medical Association and the American Naprapathic Association, is an integral part of the representative system. Lobbying activities, properly conducted, are not a constitutional defect. With this in mind, the answer to the naprapaths' complaint is to be found not in an evidentiary hearing, but in the century-old advice of the Supreme Court: "for protection against

abuses by legislatures the people must resort to the polls, not to the courts." *Munn v. Illinois,* 94 U.S. 113, 134, 24 L.Ed. 77 (1876). We find here no invidious discrimination of the sort that the Fourteenth Amendment prohibits.

Because we hold that the MPA does not violate either the equal protection or the due process clauses of the United States Constitution, we reach no conclusion as to whether the plaintiffs in *Potts v. Department of Registration and Education,* 128 Ill.2d 322, 131 Ill.Dec. 584, 538 N.E.2d 1140, *cert. denied,* 493 U.S. 992, 110 S.Ct. 540, 107 L.Ed.2d 537 (1989), were the virtual representatives of the plaintiffs in this case.

For the foregoing reasons, we AFFIRM the Rule 12(b)(6) dismissal of Maguire's claims by the district court.