CITY OF CHICAGO, Richard M. Daley, Daniel Alvarez, Sr., Commissioner of Human Services, et al., Plaintiffs–Appellants,

and

Morris I. Sinelnikov, Maximinia Carmona, Ignacia Orozco, et al., Intervenor–Plaintiffs–Appellants,

v.

Donna E. SHALALA, Secretary of Health and Human Services, John J. Callahan, Acting Commissioner of Social Security, Daniel R. Glickman, Secretary of Agriculture, et al., Defendants–Appellees.

Nos. 98–2382, 98–2479.

United States Court of Appeals, Seventh Circuit.

Argued April 1, 1999.

Decided Aug. 31, 1999.

Lawrence Rosenthal (argued), Mardell Nereim, Office of the Corporation Counsel, Appeals Division, Chicago, IL, for Plaintiffs–Appellants in No. 98–2382.

Thomas P. Walsh, Office of the United States Attorney, Civil Division, Chicago, IL, Stephanie Marcus (argued), Mark Stern, Department of Justice, Civil Division, Appellate Section, Washington, DC, for Defendants–Appellees.

David B. Goodwin, Heller Ehrman White & McAuliffe, San Francisco, CA, for Amicus Curiae.

Mardell Nereim, Office of the Corporation Counsel, Appeals Division, Chicago, IL, for Plaintiffs in No. 98–2479.

Sue Augustus, SSI Coalition for a Responsible Safety Net, Chicago, IL, Daniel J. Lesser, Poverty Law Project, National Clearinghouse for Legal Service, Chicago, IL, for Plaintiffs–Appellants in No. 98–2479.

Before WOOD, Jr., RIPPLE and KANNE, Circuit Judges.

RIPPLE, Circuit Judge.

The City of Chicago, along with several city officials and an intervenor class of legal permanent residents, brought suit against the Secretary of Health and Human Services and other federal officers to challenge certain provisions of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub.L. No. 104–193, 110 Stat. 2105 (1996) ("the Welfare Reform Act" or "the Act"), that restrict certain noncitizens' eligibility for welfare benefits. The plaintiffs alleged that the provisions of the Act that disqualify most legal aliens from receiving Food Stamps, Supplemental Security Income ("SSI"), and other welfare benefits violate the Fifth Amendment's Due Process Clause. The district court granted the defendants' motion to dismiss, and the plaintiffs appeal. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

# I

## BACKGROUND

### A. The Welfare Reform Act

The Welfare Reform Act significantly restricted the eligibility of noncitizens lawfully in the United States to receive welfare benefits. See Pub.L. No. 104–193, 110 Stat. 2105, 2262–64 (1996).[1] Section 402(a) of the Act provides that, subject to certain exceptions, "qualified alien[s]" are not eligible to receive SSI or Food Stamp benefits. 8 U.S.C. § 1612(a) (1998).[2] As de-

---

1. Congress has amended the Act twice since its original enactment in 1996. See Balanced Budget Act of 1997, Pub.L. No. 105–33, §§ 5301–5304, 5306, 5562–5563, 111 Stat. 251 (1997); Agricultural Research, Extension, and Education Reform Act of 1998, Pub.L. No. 105–185, §§ 503–508, 112 Stat. 523 (1998). The amendments restored eligibility for welfare benefits to some noncitizens by

expanding the exceptions to the provisions excluding aliens from eligibility. This opinion will refer to the provisions of the Welfare Reform Act that are currently codified, as amended, in Title 8 of the United States Code.

2. The SSI program provides supplemental security income to low-income individuals who are blind, disabled, or 65 or older. See 42

fined in § 431 of the Act, qualified aliens include permanent resident aliens, asylees, refugees, aliens who are paroled into the United States, aliens whose deportation is being withheld, aliens who have been granted conditional entry, certain Cuban and Haitian entrants, and certain "battered" aliens. *See id.* § 1641.[3]

Section 402(a)(2) enumerates several exceptions that allow various sub-groups within the qualified alien population to remain eligible for SSI, Food Stamps, or both. Refugees, asylees, aliens whose deportation is being withheld, certain Cuban and Haitian entrants, and certain Amerasian immigrants remain eligible for 7 years after the date they are admitted to the United States or are granted the relevant status. *See id.* § 1612(a)(2)(A). Permanent resident aliens who have worked for 40 qualifying quarters, as well as aliens who are veterans or on active duty (and their spouses and dependent children), retain their eligibility for the benefits. *See id.* § 1612(a)(2)(B), (C). Aliens lawfully residing in the United States who were receiving SSI benefits as of the date of enactment (August 22, 1996) retain their eligibility for SSI. *See id.* § 1612(a)(2)(E).[4] Aliens who were receiving Food Stamps on the date of enactment remained eligible thereafter for a limited grace period, which is now over. *See id.* § 1612(a)(2)(D)(ii). Aliens who were lawfully residing in the United States on the date of enactment retain eligibility for SSI if they are blind or disabled and for Food Stamps if they are "receiving benefits or assistance for blindness or disability" within the meaning of the Food Stamp Act of 1977. *Id.* § 1612(a)(2)(F). Members of Indian tribes, as defined in 25 U.S.C. § 450b(e), and certain American Indians

born in Canada remain eligible for the benefits. *See* 8 U.S.C. § 1612(a)(2)(G). Aliens who received SSI benefits after July 1996 on the basis of an application filed before January 1, 1979, also retain eligibility for SSI. *See id.* § 1612(a)(2)(H). Aliens who were either 65 or older or under 18, and were lawfully residing in the United States on the date of enactment, remain eligible for Food Stamps. *See id.* § 1612(a)(2)(I), (J). Finally, certain Hmong and Highland Laotians who are lawfully residing in the United States, and their spouses and dependent children, remain eligible for Food Stamps. *See id.* § 1612(a)(2)(K).

In § 402(b) of the Act, Congress authorized the states, subject to certain exceptions, to determine the eligibility of qualified aliens for three other federal benefit programs: Temporary Assistance for Needy Families ("TANF"), Social Services Block Grants ("SSBG"), and Medicaid. *See id.* § 1612(b). The exceptions to this provision, enumerated in § 402(b)(2), are similar to the exceptions in § 402(a)(2) and provide that certain subgroups are eligible for the designated federal programs.

### B. Proceedings in the District Court

The City of Chicago and several city officials (collectively, "the City") brought suit seeking declaratory and injunctive relief against five federal officers ("the defendants"). The City alleged that the provisions of the Welfare Reform Act that disqualify noncitizens lawfully in the United States from the various federally funded welfare programs violate the equal protection component of the Fifth Amendment's Due Process Clause and

---

U.S.C. § 1381 et seq. The Food Stamp program provides food purchasing assistance to households with low income and few resources. *See* 7 U.S.C. § 2011 et seq.

**3.** The Act also provides that, subject to certain exceptions, "illegal" or "undocumented" aliens—aliens who do not meet the definition of "qualified alien"—are ineligible for any

federal public benefit, including SSI and Food Stamps. *See* 8 U.S.C. § 1611. However, the provisions governing illegal aliens are not at issue in this lawsuit.

**4.** *See also* 8 U.S.C. § 1612(a)(2)(D)(i) (providing a grace period and reassessment for aliens who were receiving SSI on the date of enactment).

the Older Americans Act.[5] Subsequently, a number of legal permanent residents of the United States and an organization of ethnic associations with members who are legal permanent residents (collectively, "the intervenors") filed a motion to intervene, a motion for class certification, a class action complaint,[6] and a motion for preliminary injunction. The district court granted the intervenors' requests for class certification and for intervention.[7] The defendants filed separate motions to dismiss the City's and the intervenors' complaints. The district court granted the motions to dismiss. The City and the intervenors appeal.

## C. Holding of the District Court

The district court granted the defendants' Rule 12(b)(6) motions to dismiss the City's and the intervenors' complaints and denied as moot the plaintiffs' motions for preliminary injunction. The court first held that the City lacked standing to bring a claim under the Older Americans Act and therefore dismissed that claim.[8] The

court did not address the City's standing to bring a constitutional challenge to the Welfare Reform Act because it found that it had jurisdiction to reach the merits of the same claim by the intervenors.

Turning to the intervenors' claims, the court held that the claims of the SSI class and the Food Stamp claims of the non-SSI class were barred by res judicata.[9] The court then addressed the merits of the remaining claim—a constitutional challenge to the Welfare Reform Act brought by those non-SSI class members asserting TANF, SSBG, and Medicaid claims. Applying rational basis scrutiny, the court concluded that the Welfare Reform Act bears a rational relationship to several of Congress' stated goals, including encouraging self-sufficiency among immigrants, preventing public benefits from serving as an incentive to immigrate, and easing the burden on the public welfare system. The court therefore granted the defendants' motions to dismiss and denied as moot the plaintiffs' motions for preliminary injunction.

---

**5.** 42 U.S.C. §§ 3001, et seq.

**6.** The intervenors' complaint brought a claim for violation of the equal protection component of the Fifth Amendment's Due Process Clause.

**7.** The court certified two classes. The "SSI class" includes Illinois residents who are lawful permanent residents of the United States and who had their SSI benefits terminated, or had a claim for SSI benefits denied, after August 22, 1996, pursuant to the provisions of the Welfare Reform Act (8 U.S.C. § 1612). The "non-SSI class" consists of Illinois residents who are lawful permanent residents of the United States and who, after August 22, 1996, received, applied for, or will apply for Food Stamps, TANF, Medicaid, or SSBG, and who have had or will have their benefits terminated or their applications denied pursuant to the provisions of the Welfare Reform Act.

**8.** The City does not appeal the district court's ruling on the Older Americans Act claim.

**9.** The court concluded that two previous lawsuits, *Shvartsman v. Callahan*, No. 97 C 5229, 1997 WL 573404 (N.D.Ill. Sept.11, 1997),

aff'd, *Shvartsman v. Apfel*, 138 F.3d 1196 (7th Cir.1998), and *Zizumbo v. Callahan*, No. 97 C 4971 (N.D.Ill. Mar. 18, 1998), warranted the application of res judicata to bar the claims of the SSI class and the Food Stamp claims of the non-SSI class. In *Shvartsman*, a class of legal permanent resident aliens who were receiving Food Stamps and who sought citizenship before their eligibility terminated under the Welfare Reform Act challenged the implementation of the Act's citizenship requirement. They claimed that the transition procedures prescribed by the Act, coupled with the INS's delay in processing their citizenship applications, violated due process. *See Shvartsman*, 138 F.3d at 1197.

In *Zizumbo*, two permanent resident aliens whose applications for SSI benefits were filed prior to, but adjudicated after, the effective date of the Welfare Reform Act brought a class action suit challenging the application of the citizenship requirement to their SSI claims for the period before the date of enactment. The plaintiffs in *Zizumbo* did not challenge the application of the citizenship requirement to claims for benefits for the time period after the date of enactment. *See* Complaint, App. at 18B–19B.

## II

## DISCUSSION

■ The plaintiffs appeal three issues: whether the City has standing to challenge the constitutionality of the Welfare Reform Act, whether the district court erred in ruling that certain plaintiffs' claims are barred by res judicata, and whether the Welfare Reform Act is unconstitutional. As an initial matter, we note that we have jurisdiction to review the merits of the constitutional challenge without reaching the issues of the City's standing or res judicata. There is no dispute that the intervenors who have been rendered ineligible for benefits have standing to challenge the constitutionality of the Act. Thus, the district court had jurisdiction to adjudicate the merits of the constitutional claim, *see Bowsher v. Synar*, 478 U.S. 714, 721, 106 S.Ct. 3181, 92 L.Ed.2d 583 (1986), and indeed did so. We therefore have jurisdiction to review the district court's final judgment. We note further that the district court's decision to rely on res judicata as to some of the plaintiffs does not affect our ability to review the merits of the constitutional challenge. *See Maguire v. Thompson*, 957 F.2d 374, 376, 379 (7th Cir.), *cert. denied*, 506 U.S. 822, 113 S.Ct. 73, 121 L.Ed.2d 38 (1992) (affirming, on the merits, the district court's dismissal of a claim challenging the constitutionality of a statute, without reviewing the district court's alternative holding that res judicata barred the plaintiffs' claim). Because we resolve the merits of the constitutional challenge in favor of the defendants, we need not reach the issues of res judicata or the City's standing.

We turn now to the merits of the constitutional challenge to the Welfare Reform Act's citizenship requirement.

### A. Standard of Review

■ In order to assess the constitutionality of § 402 of the Welfare Reform Act, we must first determine the appropriate level of scrutiny for judicial review of the legislative enactment at issue. In *Graham v. Richardson*, 403 U.S. 365, 91 S.Ct. 1848, 29 L.Ed.2d 534 (1971), the Supreme Court held that a state statute that denies welfare benefits to resident aliens (or denies benefits to resident aliens who have not resided in the United States for a specified number of years) violates equal protection. *See id.* at 376, 91 S.Ct. 1848. Noting that aliens are a " 'discrete and insular' minority," *id.* at 372, 91 S.Ct. 1848 (quoting *United States v. Carolene Prods. Co.*, 304 U.S. 144, 152–53 n. 4, 58 S.Ct. 778, 82 L.Ed. 1234 (1938)), the Court applied "heightened" or "close judicial scrutiny" to the statutes at issue. *Id.* The Court, however, limited its holding to state legislation. Indeed, the Court devoted several paragraphs of its opinion to distinguishing between state authority to make alienage-based classifications and federal authority to do so. *See id.* at 376–78, 91 S.Ct. 1848. The Court acknowledged that the federal government's plenary authority over issues of immigration and naturalization provided an additional justification to invalidate state statutes that conflicted with over-riding national policies in this area. *See id.*

Indeed, in *Mathews v. Diaz*, 426 U.S. 67, 96 S.Ct. 1883, 48 L.Ed.2d 478 (1976), the Court made clear that the standard of scrutiny applied to state legislation in *Richardson* does not govern judicial review of federal legislation involving alienage. In *Diaz*, the Supreme Court upheld federal legislation that restricted certain aliens' eligibility for a medical insurance program based on the duration of their residence in the United States and on their admission for permanent residence.[10]

---

10. Notably, the Court characterized the issue in *Diaz* as not whether discrimination between citizens and aliens is permissible but whether discrimination within the class of aliens is permissible, because the statute ex-

cluded only those aliens who had not been in the United States for a minimum of 5 years and those who had not received permanent residence. *See Diaz*, 426 U.S. at 80, 96 S.Ct. 1883. Similarly in this case, the classifica-

The Court emphasized that "responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government," and therefore judicial review of decisions made by Congress or the President in the area of immigration and naturalization must be narrow. *Id.* at 81–82, 96 S.Ct. 1883. Although the Court did not adopt explicitly the "rational basis" standard of scrutiny, it in effect applied rational basis review, upholding the legislation because it was not "wholly irrational." *Id.* at 83, 96 S.Ct. 1883. The Court explicitly distinguished the *Richardson* case and explained that state and federal alienage classifications must be treated differently because of Congress' plenary authority to regulate the conditions of entry and residence of aliens. *See id.* at 84–85, 96 S.Ct. 1883. In short, we believe that the *Diaz* case is directly on point on the issue of what level of scrutiny should be applied to Congressional regulation of aliens' welfare benefits. *See Rodriguez v. United States*, 169 F.3d 1342, 1350 (11th Cir.1999).[11]

The plaintiffs submit that *Diaz* is not the controlling authority in this case. We shall set forth briefly why we cannot accept this argument. First, the plaintiffs submit that the Court's more recent holding in *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 115 S.Ct. 2097, 132 L.Ed.2d 158 (1995), makes clear that the strict scrutiny applied in *Richardson* should apply to federal alienage classifications as well. In *Adarand*, the Supreme Court articulated a general rule that equal protection analysis under the Fifth Amendment is the same as it is under the Fourteenth Amendment. *See id.* at 217, 115 S.Ct. 2097. However, *Adarand* itself ac-

knowledged an exception to this general rule for cases in which special deference to the political branches of the federal government is appropriate. *See id.* at 217–18, 115 S.Ct. 2097 (citing *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), a case involving federal exercise of the immigration power).

The plaintiffs also submit that the holding of *Diaz* should be limited to cases in which a durational residency requirement is necessary to maintain the fiscal integrity of an insurance program. We cannot read any such limitation into the Court's holding in *Diaz*. The Court relied on the rational link between duration of residency and the fiscal soundness of an insurance program only when evaluating whether the statute at issue satisfied the rational basis test, not when determining what level of scrutiny should apply. We therefore see no reason to limit the Court's articulation of the rational basis standard to the particular factual situation of that case.

The plaintiffs further argue that, even if federal laws enacted under Congress' plenary immigration power are subject to rational basis review, the Welfare Reform Act is not such a law because it does not regulate the terms or conditions of immigration or naturalization. A statute that makes indigent aliens deportable, they submit, would constitute an exercise of the immigration power, but the Welfare Reform Act's withdrawal of welfare benefits from resident aliens, by contrast, is not within the scope of the immigration power. We cannot accept this argument. We believe that the Court's analysis in *Diaz* makes clear that, for purposes of equal protection analysis, Congress' interest in regulating the relationship between our

tions at issue can be characterized as discrimination *among* aliens, as Congress has excluded some but not all aliens from eligibility for certain welfare benefits. As discussed above, Congress carved out numerous categories of aliens who remain eligible for such benefits. *See* 8 U.S.C. §§ 1612(a)(2), 1613(b).

11. *See also Kiev v. Glickman*, 991 F.Supp. 1090, 1095–97 (D.Minn.1998); *Abreu v. Callahan*, 971 F.Supp. 799, 807–11 (S.D.N.Y.1997); *cf. Campos v. FCC*, 650 F.2d 890, 894 (7th Cir.1981) (holding broadly that federal alienage-based classifications are subject only to narrow judicial review, and sustaining legislation conditioning the grant of commercial radio operator licenses on citizenship).

alien visitors and the national government ought not to be defined in such narrow terms as to preclude application of the rational basis test in a case such as the present one involving eligibility for government benefits. *See Diaz*, 426 U.S. at 81–83, 96 S.Ct. 1883 (characterizing Congress' decision to restrict certain aliens' eligibility for welfare benefits as a decision "in the area of immigration and naturalization" and noting that "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government"); *see also Rodriguez*, 169 F.3d at 1349.[12] In sum, we conclude that, under the holding in *Diaz*, the provisions of the Welfare Reform Act at issue in this case must be reviewed under rational basis scrutiny.

The intervenors additionally submit that, even if strict scrutiny does not apply, at least some intermediate level of scrutiny should be employed. Relying on *Plyler v. Doe*, 457 U.S. 202, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982), they argue that, because the Act imposes a severe and permanent deprivation upon a discrete and disadvantaged class, the alienage-based classification must be subjected to intermediate scrutiny. In *Plyler*, the Supreme Court applied intermediate scrutiny to a state law excluding illegal immigrant children from public education. *See id.* at 223–24, 102 S.Ct. 2382. As the Eleventh Circuit pointed out in *Rodriguez*, however, the *Plyler* case involved a state law, and nothing in the Court's opinion suggests that *Diaz* would not apply (or that heightened scrutiny would apply) if the law were federal. *See Rodriguez*, 169 F.3d at 1349–50. In fact, *Plyler* cited *Diaz* to point out that the deference owed to Congress in matters of aliens' status within our borders does not apply to state classifications

of aliens. *See Plyler*, 457 U.S. at 225, 102 S.Ct. 2382. The Court stated:

> The States enjoy no power with respect to the classification of aliens. *See Hines v. Davidowitz*, 312 U.S. 52, 61 S.Ct. 399, 85 L.Ed. 581 (1941). This power is "committed to the political branches of the Federal Government." [*Mathews v. Diaz*, 426 U.S. at 81, 96 S.Ct. 1883]. Although it is "a routine and normally legitimate part" of the business of the Federal Government to classify on the basis of alien status, *id.* at 85, 96 S.Ct. 1883, and to "take into account the character of the relationship between the alien and this country," *id.* at 80, 96 S.Ct. 1883, only rarely are such matters relevant to legislation by a State.

*Id.* (parallel citations omitted). Because the law at issue in the case before us is a federal enactment, *Plyler* does not alter our reliance on *Diaz* for the application of rational basis review to the provisions of the Welfare Reform Act.

**B. Application of the Rational Basis Test**

 We turn now to the application of the rational basis test. The Supreme Court has admonished that "rational-basis review in equal protection analysis 'is not a license for courts to judge the wisdom, fairness, or logic of legislative choices.'" *Heller v. Doe*, 509 U.S. 312, 319, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993)). Rather, a statute survives rational basis scrutiny "if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Id.* at 320, 113 S.Ct. 2637. Moreover, under rational basis review, Congress need not actually articulate the legitimate purpose or rationale that supports the classification at issue. Instead, a

---

12. The amicus suggests that deferential review is warranted only when federal legislation actually regulates "core immigration functions," not whenever the legislation merely affects immigrants. In support of this contention, the amicus cites cases that invalidated statutes that "affected" noncitizens. However, none of the cited cases addresses this issue as directly as does the *Diaz* case.

statute "must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Id.* (quoting *Beach Communications*, 508 U.S. at 313, 113 S.Ct. 2096) (internal quotation marks omitted). We are required, under the rational basis standard, "to accept a legislature's generalizations even when there is an imperfect fit between means and ends. A classification does not fail rational-basis review because it 'is not made with mathematical nicety or because in practice it results in some inequality.'" *Id.* at 321, 113 S.Ct. 2637 (quoting *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (quoting *Lindsley v. Natural Carbonic Gas Co.*, 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911))) (internal quotation marks omitted).

■ The policy objectives that Congress hoped to achieve through the enactment of the Welfare Reform Act are set forth in 8 U.S.C. § 1601.[13] First, Congress stated that the Act's provisions are intended to foster the legitimate governmental purpose of encouraging aliens' self-sufficiency.

It is Congress' stated policy that "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations." 8 U.S.C. § 1601(2)(A). The plaintiffs submit that, because federal immigration policy already prohibits the immigration of those who are likely to become public charges, the benefits at issue in this case serve only as a safety net. Therefore, they contend, it is irrational to remove this safety net in an effort to encourage aliens to be more reliant on their families, sponsors, and private organizations because it is precisely those aliens who are unable to rely on such alternate sources of support who need the benefits in the first place. Moreover, they argue, removing welfare benefits from aliens who are elderly, disabled, or children will not help them become self-reliant because they are simply unable to work.

Whatever the merits of this criticism of the Welfare Reform Act, as a matter of public policy, we cannot say that the statute is rendered irrational simply because *some* aliens who are unable to work will

---

13. 8 U.S.C. § 1601, titled "Statements of national policy concerning welfare and immigration," provides:

The Congress makes the following statements concerning national policy with respect to welfare and immigration:

(1) Self-sufficiency has been a basic principle of United States immigration law since this country's earliest immigration statutes.

(2) It continues to be the immigration policy of the United States that—

(A) aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations, and

(B) the availability of public benefits not constitute an incentive for immigration to the United States.

(3) Despite the principle of self-sufficiency, aliens have been applying for and receiving public benefits from Federal, State, and local governments at increasing rates.

(4) Current eligibility rules for public assistance and unenforceable financial support agreements have proved wholly incapable of assuring that individual aliens not burden the public benefits system.

(5) It is a compelling government interest to enact new rules for eligibility and sponsorship agreements in order to assure that aliens be self-reliant in accordance with national immigration policy.

(6) It is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.

(7) With respect to the State authority to make determinations concerning the eligibility of qualified aliens for public benefits in this chapter, a State that chooses to follow the Federal classification in determining the eligibility of such aliens for public assistance shall be considered to have chosen the least restrictive means available for achieving the compelling governmental interest of assuring that aliens be self-reliant in accordance with national immigration policy.

8 U.S.C. § 1601 (Supp.1999).

not be induced to provide for themselves. In Congress' view, such aliens ought to rely on their families, sponsors, or private organizations for support, rather than on the public welfare rolls. The statute is reasonably related to that goal. Indeed, even if some aliens have no access to support from these alternate sources, the citizenship requirement is still rationally related to the goal of encouraging aliens to rely on private, not public, resources to meet their needs. *See Heller*, 509 U.S. at 321, 113 S.Ct. 2637 (noting that rational basis review requires courts to "accept a legislature's generalizations even when there is an imperfect fit between means and ends"); *Zehner v. Trigg*, 133 F.3d 459, 463 (7th Cir.1997) ("[T]he classification need not be the most narrowly tailored means available to achieve the desired end."); *see also Kiev*, 991 F.Supp. at 1099–1100; *Abreu v. Callahan*, 971 F.Supp. 799, 818 (S.D.N.Y.1997).

Congress has stated its policy that "the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(2)(B). Although reasonable individuals certainly can disagree on the wisdom of controlling immigration through such a policy, we must conclude that the provisions of the Welfare Reform Act are rationally related to the legitimate governmental goal of discouraging immigration that is motivated by the availability of welfare benefits. In reference to state welfare benefits, the Supreme Court has acknowledged that "[a]lien residency requirements for welfare benefits necessarily operate ... to discour-

age entry into or continued residency in the State." *Richardson*, 403 U.S. at 379, 91 S.Ct. 1848. We cannot say, therefore, that it was irrational for Congress to conclude that removal of federal welfare benefits would have a similar deterrent effect on immigration into the United States. The plaintiffs submit that there is no rational connection between withdrawing benefits from legal resident aliens who were already in the United States when the Act was enacted and the goal of deterring future immigrants from coming here to reap welfare benefits. Although the Act may be overinclusive in this respect, again, rational basis scrutiny does not require a perfect fit. We therefore are constrained to hold that there is a rational relationship between the Welfare Reform Act's restriction of aliens' eligibility for welfare benefits and the legitimate governmental goal of deterring immigration that is motivated by the availability of those benefits.

Section 1612 also declares that Congress wanted to preserve the public fisc by reducing the rising costs of operating federal benefits programs. The plaintiffs suggest, however, that the distinction between citizens and noncitizens is no more rationally related to the general goal of saving money than would be a distinction between brown-eyed people and all other people; disqualifying any subset of eligible people will save money. But again, we cannot say that it was irrational for Congress to decide to achieve its budget objectives by eliminating aliens from these programs.[14]

**14.** Congress had before it evidence that aliens were receiving welfare benefits in increasing numbers. *See, e.g., Supplemental Security Income: Problem Areas and Possible Reforms, Hearing on Supplemental Security Income Before the Senate Comm. on Finance*, 1995 WL 128208 (F.D.C.H. Mar. 27, 1995) ("Another factor underlying the growth of SSI ... is the rapid growth of aliens on the rolls. According to the General Accounting Office, in 1993 the number of aliens on SSI was 683,000, or about 12% of the SSI caseload, up from 3% in 1982, at an annual cost of $3.3 billion.... The rising share of alien recipients is not unique to SSI; it has been observed in each of the major federal public assistance programs—Medicaid, SSI, AFDC, and Food Stamps ...." (footnote omitted)); *Proposals to Reduce Illegal Immigration, Hearing Before the Senate Comm. on the Judiciary*, 1995 WL 110439 (F.D.C.H. Mar. 14, 1995) ("The number of SSI recipients who are aliens has been increasing steadily. In December 1994, there were a little more than 738,000 aliens receiving SSI benefits. This is double the number of aliens receiving benefits 5 years ago. Alien recipients now constitute nearly 12 percent of the total number of SSI recipients.").

In effectuating the governmental goal of cost savings, Congress had to start somewhere and "must be allowed leeway to approach a perceived problem incrementally." *Beach Communications*, 508 U.S. at 316, 113 S.Ct. 2096. Moreover, Congress was entitled to conclude that achieving savings by eliminating these benefits to aliens was sufficiently compatible with the other policy objectives that it sought to foster through this legislation.

The Executive Branch, defending the constitutionality of the statute before this court, offers a further justification not found in Congress' statement of policy. It submits that the Act's provisions are rationally related to the legitimate governmental purpose of encouraging naturalization. The Act gives resident aliens in need of welfare benefits a strong economic incentive to become naturalized citizens. The plaintiffs again argue overinclusiveness, contending that the statute removes from eligibility certain aliens who cannot seek naturalization, such as elderly or disabled aliens who cannot demonstrate language proficiency or an understanding of United States history and government. The plaintiffs further submit that it is irrational to use the threat of starvation and homelessness to goad people into naturalization. Again, whatever the merits of these arguments in the public policy arena, we cannot accept them as a basis for rendering the statute unconstitutional. This court and other courts of appeals have recognized the legitimacy of this governmental interest in encouraging naturalization. *See, e.g., Campos v. FCC*, 650 F.2d 890, 894 (7th Cir.1981); *Mow Sun Wong v. Campbell*, 626 F.2d 739, 745 (9th Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1419, 67 L.Ed.2d 384 (1981). The Supreme Court assumed in *Hampton v. Mow Sun Wong*, 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976), that the "national interest in providing an incentive for aliens to become naturalized" would justify a citizenship requirement for federal civil service employment. *Id.* at 105, 96 S.Ct. 1895. We cannot say, therefore, that it

would be irrational for Congress to conclude that restricting the availability of welfare benefits to aliens would provide incentive for aliens to seek naturalization. *See Kiev*, 991 F.Supp. at 1100; *Abreu*, 971 F.Supp. at 817–18. As we have already mentioned, rational basis scrutiny does not require a perfect fit between this legitimate governmental purpose and the means chosen to achieve it.

The plaintiffs submit finally that the Act fails rational basis review because it was motivated by impermissible animus toward noncitizens. We disagree. As the Supreme Court made clear in *Diaz*, "it is obvious that Congress has no constitutional duty to provide all aliens with the welfare benefits provided to citizens." *Diaz*, 426 U.S. at 82, 96 S.Ct. 1883. "In the exercise of its broad power over naturalization and immigration, Congress regularly makes rules that would be unacceptable if applied to citizens. . . . The fact that an Act of Congress treats aliens differently from citizens does not in itself imply that such disparate treatment is 'invidious.'" *Id.* at 79–80, 96 S.Ct. 1883. In light of the various rationales discussed above, we cannot say that the Welfare Reform Act is "inexplicable by anything but animus toward the class that it affects." *Romer v. Evans*, 517 U.S. 620, 632, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

■ Finally, we note that the Welfare Reform Act also contains a number of exceptions to its general exclusion of aliens from the welfare programs. Like the situation that confronted the Supreme Court in *Diaz*, therefore, we have a statutory scheme that, strictly speaking, distinguishes not between citizens and aliens but rather among subclasses within the alien population. *See Diaz*, 426 U.S. at 80, 96 S.Ct. 1883. Nevertheless, we do not believe that the exceptions carved out by Congress from its general prohibition against benefits to aliens, detracts from the rationality of the overall statutory scheme. Although Congress did not artic-

ulate a reason for each of these exceptions, we must accept Congress' determination because we can discern "a rational relationship between the disparity of treatment and some legitimate governmental purpose." *Heller*, 509 U.S. at 320, 113 S.Ct. 2637. As the Court of Appeals for the Eleventh Circuit explained in *Rodriguez v. United States*, 169 F.3d 1342 (11th Cir.1999), several of the exceptions extend benefits to aliens who have made special contributions to this Country.[15] It certainly is not irrational for Congress to reward such service or to encourage other aliens to make similar contributions in the future. Five of the other exceptions ensure benefits to individuals who have sought refuge in this Country because of especially difficult conditions in their own countries.[16] Certainly, humanitarian concerns can constitute a rational basis for distinguishing among aliens. Although some might disagree with the distinctions Congress has made in this regard, such line-drawing is its prerogative, not the judiciary's. See *Heller*, 509 U.S. at 319, 113 S.Ct. 2637. Nor was it irrational for Congress to have excluded from the general ban those already residing in the United States who have an affliction or a condition that makes them particularly vulnerable to poverty.[17] No doubt, there is some question whether Congress included within the excepted class all those who should have been included. Drawing such lines, however, is a legislative task for Congress. "[D]ifferences between the eligible and the ineligible are differences in degree rather than differences in the character of their respective clams." *Diaz*, 426 U.S. at 83–84, 96 S.Ct. 1883. The provision permitting the continuation of SSI benefits for those who are already receiving them and who appear to continue to meet the eligibility criteria is similarly not irrational;[18] Congress was entitled to weigh the cost of terminating such a program against the cost of continuation. Finally, members of Indian tribes have a unique historical relationship with the Federal Government, and therefore it certainly was not irrational for Congress to determine that it ought to continue to provide them benefits.[19]

### Conclusion

We conclude that the citizenship requirements in § 402 of the Welfare Reform Act do not offend equal protection. We hold that *Mathews v. Diaz* requires the application of rational basis review and that the Act survives that level of scrutiny because it is rationally related to legitimate governmental purposes. Accordingly, the judgment of the district court is affirmed.

AFFIRMED.

---

**15.** In this category are aliens who have assisted the Nation's economy by working at least 40 quarters (10 years), aliens who are veterans or active military personnel, and members of the Hmong and Highland Laotian tribes who provided assistance to the United States during the Vietnam War. *See* 8 U.S.C. § 1612(a)(2)(B), (C), (K).

**16.** In this category are refugees, asylees, aliens whose deportation has been withheld because of fear of persecution, and certain Cuban, Haitian and Amerasian immigrants. *See* 8 U.S.C. § 1612(a)(2)(A).

**17.** Included in this category are those who resided in the United States at the time of the passage of the statute and who are blind, disabled, or in their old age or youth. *See* 8 U.S.C. § 1612(a)(2)(E), (F), (I), (J).

**18.** *See* 8 U.S.C. § 1612(a)(2)(D), (E), (H).

**19.** *See* 8 U.S.C. § 1612(a)(2)(G).